**Ted SHANKS and Roger Shanks, natural Guardian of Ted Shanks, Plaintiffs-Appellants,**

v.

**A. F. E. INDUSTRIES, INC., Defendant-Appellee.**

No. 1–479A102.

Court of Appeals of Indiana, First District.

April 22, 1980.

Rehearing Denied May 22, 1980.

Thomas N. Mote, G. Terrence Coriden, Lawson, Pushor, Mote & Coriden, Columbus, for appellants.

William C. Moore, Steckbeck, Moore & Cohen, Indianapolis, John T. Sharpnack, Sharpnack, Bigley, David & Rumple, Columbus, for appellee.

NEAL, Judge.

## STATEMENT OF THE CASE

Plaintiff-appellant Ted Shanks[1] appeals a judgment on the evidence for defendant-appellee A.F.E. Industries, Inc. (A.F.E.), entered at the close of the plaintiff's evidence by the Bartholomew Circuit Court.

Two issues are raised for our review:
I. Whether the judgment is contrary to the law and the evidence; and
II. Whether the trial court erroneously excluded certain exhibits and testimony.
· We reverse.

In the fall of 1973, Ted Shanks was enrolled in a high school agricultural cooperative program, a part of which consisted of

employment at Grammer Elevator, Inc. (Grammer), a commercial feed mill and grain elevator. He was repairing an elevator leg which was connected to an automatic grain dryer manufactured by A.F.E. when the elevator leg began to move, severely and permanently injuring his left leg.

Plaintiff filed suit against A.F.E. for the personal injuries suffered by him under the theories of breach of implied warranty and strict liability in tort under § 402A of the Restatement (Second) of Torts (1965).[2] The trial court granted A.F.E.'s motion for judgment on the evidence at the close of the plaintiff's evidence under Ind. Rules of Procedure, Trial Rule 50(A)(1) and entered judgment for A.F.E. Although plaintiff raised allegations of error relating to the theory of breach of implied warranty in his motion to correct errors, he has not argued these allegations on appeal and has waived them under Ind. Rules of Procedure, Appellate Rule 8.3(A)(7).

The rule in Indiana with respect to a motion for judgment on the evidence pursuant to T.R. 50 is that such motion may properly be granted only if there is no substantial evidence or reasonable inferences derived therefrom supporting an essential element of the claim, a complete failure of proof, and that in considering such motion, the trial court must consider only the evidence and reasonable inferences therefrom most favorable to the non-moving party. *Ortho Pharmaceutical Corp. v. Chapman*, (1979) Ind.App., 388 N.E.2d 541; *Gregory v. White Truck & Equipment Co., Inc.*, (1975) 163 Ind.App. 240, 323 N.E.2d 280.

Restatement (Second) of Torts, § 402A has been expressly adopted as the law of Indiana, and is as follows:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property

---

1. Roger Shanks, as natural guardian of Ted Shanks, was also a party plaintiff in this cause in a representative capacity.

2. This cause of action arose before the effective date of Ind.Code 33–1–1.5–1 *et seq.* (Supp. 1979) which codifies and restates the common law of Indiana with respect to strict liability in tort.

is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it was sold.

(2) The rule stated in the Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

■ A prima facie case is established by evidence of 1) a purchase 2) from a seller engaged in the business of selling such a product 3) of a defective product 4) and the product reached the user or consumer without substantial change in its condition and 5) the product caused physical harm to the user or consumer because of the defect. *Ayr-Way Stores, Inc. v. Chitwood*, (1973) 261 Ind. 86, 300 N.E.2d 335; *Ortho Pharmaceutical Corp., supra.*

### FACTS

A proper understanding of the case requires a lengthy recital of the evidence presented by the plaintiff. We consider only that evidence which was most favorable to the plaintiff. Grammer, a firm engaged in the business of buying grain from farmers and reselling it on the market, purchased the grain dryer in question in 1967. Charles Whittington, part owner and manager of Grammer, purchased the dryer from A.F.E. through a distributor in Michigan. Whittington went to Zurich, Illinois, with his own truck, and transported the dryer to Grammer. It was accompanied by an owner's manual. The dryer had a capability which was stated in the manual to function manually or automatically in conjunction with other auxiliary equipment, which auxiliary equipment could assume a variety of forms and functions, depending upon the desires of the owner. The dryer was at first used manually at an old elevator complex.

In 1969, Grammer, through the efforts of Whittington, built an entirely new grain elevator complex. Whittington wanted an entirely automatic grain drying system that "would run by itself as much as possible." Whittington, a Purdue University agricultural graduate experienced in grain handling and farm operations, approached four firms and asked them to submit plans and designs for the desired complex. He selected the plans and design of Barnes Construction Company (Barnes) and awarded it the contract. Barnes built the complex, but did not design or install any electrical wiring or electrical equipment. The complex, as built, consisted of a pit into which grain was dumped from the farm trucks, an elevator leg, several cylindrical metal storage bins, a central shed, the necessary augers, electric motors, and machinery, and the A.F.E. dryer which was moved from its prior location to the new complex.

Grammer, through Whittington, employed the firm of Auto Electric to design the electrical functions and wire the entire complex. The entire complex was operated electrically. Auto Electric created the design, furnished all the electrical equipment in the complex, and installed such equipment. The end result of the installation of the electrical fixtures, as relevant here, was the creation of a central control shed containing all switches, boxes, fuses, breakers, and controls which operated every piece of machinery and every electric motor in the complex, including the dryer, augers, and elevator leg.

The planning and the construction of the complex and the design and installation of the electrical fixtures were done only after close consultation with and approval by Whittington. Auto Electric did no wiring whatsoever internally within the dryer. It merely wired the dryer into the system in compliance with the recommendations contained in the manual furnished by A.F.E. by attaching its wires to terminals on the dryer.

Upon completion, the drying operation worked automatically in four phases. In the first phase, an auger brought wet grain from a wet grain storage bin to the top of the dryer and filled it. The second phase was the drying of the grain. This was accomplished by heat, generated by a fuel-fired heating device in the dryer, forced by means of fans through and around the grain. The third phase was the cooling phase during which the grain was cooled with the aid of fans. The fourth phase was the unload phase. Here the dried grain was removed from the dryer by means of an auger in the bottom of the dryer and was, by means of yet another auger, transported to the base of the elevator leg which was located close to the dryer. The elevator leg then elevated the grain to a point high over the complex of bins and dumped it into a pipe which carried the grain to the selected bin for storage. The four-phase cycle was then repeated.

The entire operation was automatic. The dryer, inherently and as designed and manufactured by A.F.E., had a system of switches and timers on it that would activate, time, and control the four-phase drying cycle according to predetermined settings. The auxiliary equipment, consisting of the storage bins, augers from the wet storage bins, augers to transport the dried grain to the elevator leg, and the leg, was not manufactured nor installed by A.F.E. However, the dryer was designed, manufactured, advertised, and sold with the contemplation and representation that it could be used in conjunction with such equipment. Such was anticipated by A.F.E. in its owner's manual. Further, the controls installed in the dryer by A.F.E. activated and governed all phases described above and controlled the auxiliary equipment. The internal controls of the dryer were wired by means of its terminals through the central control shed, and the dryer could be turned off and on from the central control shed.

When the dryer switch in the central control shed was in an "off" position or when the dryer was in a load, dry, or cool cycle, the elevator leg could be operated independently by means of its own switch.

This was necessary because, in addition to drying, the elevator leg was used in most functions in the complex where grain was handled whether the grain was to be dried or not. However, even when the elevator leg switch was in an "off" position and the dryer commenced its unload phase, the dryer, through its internal automatic control devices which were wired through the central control shed to the elevator leg, activated the elevator leg. This was necessary for if the dryer began its unload phase and the elevator leg did not commence to operate simultaneously, there would accumulate a glut of grain at the base of the leg with resulting spillage. The elevator leg consisted of a tall metal housing inside of which ran an endless revolving chain with buckets attached to it. The buckets scooped up grain from a pit at the base of the leg brought to that point by augers, carried the grain to the top of the leg, and dumped it into pipes where it descended to the selected bin for storage.

Whittington, being instrumental in the design and construction of the complex, understood its operation thoroughly from the beginning and, as relevant here, understood that when the elevator leg switch was in an "off" position, and the dryer was operating, and the dryer commenced its unload phase, the dryer's controls activated the elevator leg automatically.

Plaintiff, a 17-year-old boy, was an employee of Grammer. Whittington explained to him the general operation of the complex including the control shed and the switches, but told him to leave the dryer alone. Plaintiff did not know that the dryer's operation would activate the elevator leg automatically even if the elevator leg switch was in an "off" position.

On this particular day a bucket was loose from the chain in the elevator leg and plaintiff volunteered to repair it. Whittington approved with the admonition that plaintiff turn everything off. It was necessary to rotate the defective bucket to an inspection door in the housing on the leg by power in order to effect repairs. This was

accomplished by plaintiff's using the separate elevator leg switch and watching the door, which was the customary way. The defective bucket passed the inspection door slightly because of the inertial lag after power was cut by turning off the independent leg switch, and after turning the switch off, plaintiff attempted with his leg and the weight of his body to push the chain backward to place the defective bucket in front of the inspection door, which technique was also customary. At this point the dryer commenced its unload phase, thereby automatically activating the elevator leg, and plaintiff was severely injured.

## ISSUES

No issue is raised concerning purchase, that the seller was engaged in the business of selling, or that the product reached the user or consumer without substantial change. These matters are conceded. The controverted issues concern whether the product was defective and whether the product caused the harm because of any defect. More specifically, those controverted issues as argued in the briefs may be stated as follows:

I. Whether the manufacturer of a component of a continuous operation, large complex, or machine is liable under § 402A.

II. Whether sufficient notice, instructions, and warning were given by A.F.E. of any dangerous propensities of the dryer.

III. Whether there existed feasible safety devices in the form of bells, lights, and switches, and whether A.F.E. had a duty to install them.

IV. Whether the operation of the dryer was the proximate cause of the injuries.

V. Whether the court erred in excluding certain evidence.

## DISCUSSION AND DECISION

At the trial, plaintiff entered evidence, through a design expert, that proper safety features might include warnings of the characteristics of the dryer in the manual, a bell or light that would be activated 30 seconds prior to when the unload phase commenced, or a switch on the leg that would absolutely stop the leg under any circumstances if repairs were in progress. Plaintiff's essential argument is that the characteristics of the dryer in activating the elevator leg without warning when it commenced the unload phase rendered the dryer unreasonably dangerous within the contemplation of § 402A.

A.F.E. contends that the dryer was not defective. It argues that the complex, including the injury-producing elevator leg, was built by others than A.F.E. The dryer performed perfectly, as it was designed to perform, its intended function. There was no hidden danger because Whittington knew all about the automatic characteristics of the dryer. It further argues that complex did the damage not the dryer, and since A.F.E. did not design and build the complex, it cannot be held liable.

■ At least three types of unreasonably dangerous defects may exist under § 402A. A product may be defective because of manufacturing flaws, defective design, or failure to supply complete information about the product's danger. *Burton v. L. O. Smith Foundry Products Co.*, (7th Cir. 1976) 529 F.2d 108. We perceive the problem to be one of notice, warning, or instruction or, in the alternative, safety devices in the form of a bell or light warning of when the dryer would unload, and thereby activating the elevator leg automatically. It is conceded by both sides that the dryer operated exactly as it was intended to operate by A.F.E. and as contemplated by Whittington. No manufacturing flaw is involved nor is there a design flaw involved as to its operating characteristics. In short, the dryer did what it was designed to do, that is, run the four-phase drying cycle automatically. The dryer must operate as it did to retain the desired automatic characteristic for otherwise a workman must monitor it at all times. This automatic characteristic was contemplated by both the seller and the buyer.

## ISSUE I: COMPONENTS

The first proposition to be disposed of is that the dryer, being only one part or component of a continuous operation, was manufactured by A.F.E.; the injury-producing component, the elevator leg, was manufactured by another; the design and construction of the total complex were by yet a third person; and the wiring design and installation were by yet a fourth person. In the case of *Cornette v. Searjeant Metal Products, Inc.*, (1970) 147 Ind. App. 46, 258 N.E.2d 652, the court considered a situation where a punch press was manufactured and sold by one company but the safety device attached to the punch press by the consumer was manufactured and sold by another company. The malfunctioning safety device was the catalyst of the injury, though the press was the injury-producing agent. In a suit by a workman against the manufacturer of the safety device, the ruling of court in effect held that products liability under § 402A for injury to an ultimate user or consumer is extended to the supplier of a defective component. In *Cornette, supra*, the plaintiff was denied recovery only because of an alteration in the safety device by the consumer. We believe the proper rule to be that the manufacturer of a component is liable under § 402A for injuries to an ultimate user or consumer for a defect where the defective component renders the product in which the component is incorporated unreasonably dangerous. This rule is subject to the limitation that the manufacturer of the component must contemplate that the component be used in the manner in which it was used. A manufacturer cannot be responsible for a combination which it did not recommend or foresee and which it had no way of guarding against at the factory. *See* 72 C.J.S. Supp. *Products Liability* § 15 (1975). *See also DeSantis v. Parker Feeders, Inc.*, (7th Cir. 1976) 547 F.2d 357. Here the evidence is clear that the dryer was used in the manner contemplated by A.F.E., that is, as a component coupled with auxiliary equipment to form a functioning unit.

## ISSUE II: NOTICE, INSTRUCTIONS, AND WARNING

Relative to notice, instructions, and warning, it has been held that a product, although virtually faultless in design, material, and workmanship may be deemed defective so as to impose liability under § 402A for harm resulting from its use, where the manufacturer fails to discharge a duty to the ultimate user or consumer to warn or instruct with respect to potential dangers in the use of a product. *Nissen Trampoline Company v. Terre Haute First National Bank*, (1975) Ind.App., 332 N.E.2d 820, *rev'd on other grounds*, 265 Ind. 457, 358 N.E.2d 974. A defect can be found from a complete absence of warning or inadequate warning. The test of the adequacy of warning is whether the warning is reasonable under the circumstances. *Ortho Pharmaceutical Corp., supra*. Duty to warn is conditional as to whether seller knows or should know of danger. Restatement (Second) of Torts § 402A, Comment j; *Hunsberger v. Wyman*, (1966) 247 Ind. 369, 216 N.E.2d 345; *Ortho Pharmaceutical Corp., supra*. Whether the duty to warn the ultimate user or consumer has been fully discharged by the manufacturer is ordinarily a question for the jury. 72 C.J.S. Supp. *Products Liability* § 84; *Ortho Pharmaceutical Corp., supra*; *Gilbert v. Stone City Construction Company, Inc.*, (1976) Ind.App., 357 N.E.2d 738.

The problem involved here concerns Whittington's knowledge of the fact that the dryer in its unload phase activated the elevator leg. Of course such an automatic function could be a trap to the unwary such as the plaintiff who was not cognizant of this function. The question is then presented: what class of persons must the manufacturer actually warn in order to fulfill his duty to the ultimate user. When the sale was made in 1967, the complex did not exist nor was plaintiff an employee. In *Burton, supra*, the Seventh Circuit Court of Appeals, applying Indiana law in a diversity case, addressed itself to this type of situation and reasoned that the manufacturer had no control over the work space, the

machine, or the hiring, instruction, or placement of personnel, and so the duty to warn and instruct the ultimate user was satisfied when the manufacturer adequately warned or instructed those employees of the purchaser who were responsible for receiving the product, and it was the responsibility of those employees to post warnings and take other precautions relative to the ultimate user, e. g., the personnel operating the machine. We agree with that reasoning and find it applicable to this situation. *Burton* further held that a duty to warn exists only to those to whom the warning would go who can reasonably be assumed to be ignorant of the facts. Here Whittington was not ignorant of the facts. He perfectly well knew the characteristics of the dryer, wanted it that way, ordered it that way, and caused it to be installed in the new complex to work automatically in conjunction with the leg. No additional warning or literature that could be furnished him by A.F.E. at the time of the sale could have improved upon his understanding of the characteristics of the machine. Under the facts of this case, it would have been quite impossible for A.F.E. at the time of the sale to instruct plaintiff, as he did not exist as an employee at that time, or to make any suggestions relative to installation, for the complex had not yet been designed or built. Grammer, through Whittington, controlled the work space, controlled the employment and placement of personnel, and controlled the dryer, and the duty on the part of A.F.E. to instruct was satisfied under the authority of *Burton, supra.* Proximate cause for lack of warning and instruction in the manual or other literature was broken by Wittington's knowledge and his duty to instruct his employees. *See* 72 C.J.S. Supp. *Products Liability* § 30. We therefore are of the opinion that plaintiff's theory of liability predicated on the lack of instructions and warning in the manual or other literature is untenable.

## ISSUE III: FEASIBLE SAFETY DEVICES

Plaintiff presented evidence that there existed feasible safety devices consisting of a bell that would ring or a light that would go on 30 seconds prior to the commencement of the unload phase and the simultaneous activation of the elevator leg, and a switch on the leg that could completely turn off its operation. *Gilbert, supra,* held that those who come in contact with a product may reasonably expect a seller to provide feasible safety devices to protect them from the dangers created by the design or function. A bystander is within the protection of this rule. A product may fail to meet reasonable safety expectations by failing to cope with foreseeable mishaps by lacking safety devices.

The obvious purpose of the recommended bell, light, or claxon would be to warn workmen, who may be in sufficiently close proximity to the automatic machinery to be injured, that it was to be activated. We draw a distinction between a duty on the part of the manufacturer to give warning or instruction concerning the dangerous propensity and use of a machine by means of manuals, labels, or other literature or means which inform, and alarms which are integral parts of machines which warn of imminent movement or action. Alarms in the latter instance are more accurately described as safety devices.

Such alarms or warning devices have numerous parallels in our law. Some of the most obvious examples are traffic signals, train whistles, car horns, sirens on emergency vehicles such as police cars, fire trucks and ambulances, railroad flasher lights, fire alarms, drawbridge-raising alarms, brake lights, etc. No citation of authority is necessary to demonstrate that those kinds of warning devices have their basis in our statutes and case law, and the lack of such warning devices, or the malfunctioning of such warning devices, may be, under certain facts, made a basis for an action for negligence. The purpose of such warning devices is not to inform persons that trains exist and can be dangerous or that emergency vehicles exist and can cause them harm, for people know that. The purpose of such warning devices is to inform persons in the immediate vicinity in a possible

position of peril that something is about to move, something is about to stop, something is coming down the track or road, or some instrumentality is in operation or is about to be placed in operation that could cause harm. This fact of imminent movement or time of movement is what people do not know, and the function of the alarm is to alert them to such movement that could cause them harm.

In the case of machinery that is activated automatically and operates in phases and cycles, even though the workman knows of the function, it is questionable that he would know at all times the exact moment that it would activate. Further, a workman, as a result of inattention caused by fatigue or some distraction, can momentarily forget such an automatic function or the timing thereof. See Marschall, *An Obvious Wrong Does Not Make a Right: Manufacturers' Liability for Patently Dangerous Products*, 48 N.Y.L.Rev. 1065 (1973).

In *Gilbert, supra*, as a part of its ruling, the court said that failure to provide feasible safety devices can render a product unreasonably dangerous. A manufacturer has a duty to exercise legal care in safeguarding the consumers of his product against reasonably foreseeable risks. He is required to adopt those feasible devices the absence of which renders a product unreasonably dangerous. 72 C.J.S. Supp. *Products Liability* § 22; *Gilbert, supra*. The knowledge by the owner or receiver of the dangerous propensity of a machine will not as a matter of law insulate the seller from a claim of a workman under § 402A for failure to install feasible safety devices. *Wheeler v. Standard Tool and Manufacturing Company*, (2nd Cir. 1974) 497 F.2d 897. Analysis of safety device cases indicates they do not necessarily turn on knowledge. They seem to turn on the feasibility of the safety device and the foreseeability of harm to users. 72 C.J.S. Supp. *Products Liability* § 22. The safety device is engrafted upon the machine and immediately affects the user and is therefore different from where merely informative warning or instruction is involved. In the latter instance it is impossible for the manufacturer in all cases to warn or instruct all the people who may come in contact with the machine for the manufacturer does not control the work space, the hiring, placement, and instruction or personnel, or the machine, as we held above.

The questions of the feasibility of safety devices and the foreseeability of harm are part of the considerations before the trier to determine the ultimate question of whether a product is defective and unreasonably dangerous, that is, dangerous to an extent beyond that contemplated by the ordinary consumer with the ordinary knowledge common to the community as to its characteristics. Restatement (Second) of Torts § 402A, Comment i. This is a question for the jury. *Bemis Company, Inc. v. Rubush*, (1980) Ind.App., 401 N.E.2d 48; *Gilbert, supra*.

In this instance the evidence disclosed that the dryer was located close to the elevator leg. Both were controlled by the internal action of the dryer in coordination with its own function. The evidence of bells and lights on the dryer as feasible safeguards is of sufficient probative value to go to the jury.

The further evidence concerning a switch and other controls away from the dryer to turn the elevator leg off completely is not sufficient to impose liability on A.F.E. for the reason that the complex was not built by A.F.E., and A.F.E. could not possibly control that. It may well have been a good idea but that is the responsibility of others not A.F.E. *Burton, supra*.

## ISSUE IV: PROXIMATE CAUSE

A.F.E. argues that the performance of the dryer was not the proximate cause of the injury. It contends that Grammer caused the complex to be designed and built by Barnes and caused the writing and electrical components and controls to be designed and built by Auto Electric, and that A.F.E. had no control in this operation. Therefore, A.F.E. contends, any fault for the accident rests with the owner or the

companies who designed and built the complex.

*Ortho Pharmaceutical Corp., supra,* presented the following discourse on proximate cause, in 388 N.E.2d at 555:

> "Proximate cause is commonly defined as 'that cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produces the result complained of and without which the result would not have occurred.' *Johnson v. Bender,* (1977) Ind.App., 369 N.E.2d 936, 939. This latter language describes what is known as the 'but-for' test. A fundamental element of proximate cause is that the injury or consequence of the wrongful act be of a class reasonably foreseeable at the time of that act. *Elder v. Fisher,* (1966) 247 Ind. 598, 217 N.E.2d 847; *Meadowlark Farms, Inc. v. Warken, supra* [(1978) Ind.App., 376 N.E.2d 122]. The defendant's act need not be the sole proximate cause; many causes may influence a result. *Meadowlark Farms, Inc. v. Warken, supra,* 376 N.E.2d at 129. The question is whether 'the original wrong was one of the proximate rather than remote causes.' *Dreibelbis v. Bennett,* (1974) 162 Ind.App. 414, 319 N.E.2d 634, 638. Thus, 'the ultimate test of legal proximate causation is the reasonable foreseeability. The assertion of an intervening, superceding cause fails to alter this test.' *Id.* Rather, [W]here harmful consequences are brought about by intervening independent forces the operation of which might have been reasonably foreseen, then the chain of causation extending from the original wrongful act to the injury is not broken by the intervening and independent forces and the original wrongful act is treated as a proximate cause. *New York Central R. Co. v. Cavinder,* (1965) 141 Ind.App. 42, 211 N.E.2d 502, 508. Proximate cause is generally a question for the trier of fact."

Here the evidence disclosed that A.F.E. anticipated and contemplated that the dryer would be used automatically in conjunction with auxiliary equipment such as involved here, which equipment would be activated and regulated by the dryer's controls. A.F.E. had knowledge that its dryers similar to this one were used in other complexes such as this. A.F.E. further knew that employees, ranging from teenage boys to men about 70 years old, worked around such establishments. A manufacturer must anticipate the environment in which the product is used and the reasonably foreseeable risks which the use in the environment entails. Such risks are inherent in the proper use of the product. *Huff v. White Motor Corporation,* (7th Cir. 1977) 565 F.2d 104 (applying Indiana law in ordinary care); 72 C.J.S. *Products Liability* § 55.

We are of the opinion that there is sufficient evidence to go to the jury on the question of proximate cause. As stated in *Ortho Pharmaceutical Corp., supra,* it is not necessary for the functioning of the dryer to be the *sole* proximate cause; it is sufficient if it is *a* proximate cause. There is evidence from which the trier could conclude that such an injury was foreseeable and that the failure to provide a safety device in the form of a claxon, bell, or light to alert workmen of the imminent commencement of an automatic sequence was a proximate cause of the injury. Assuming *arguendo* that Whittington or the designers and builders of the complex were also at fault in failing to instruct employees or to take precautions, it would not absolve A.F.E. if the dryer was defective because of absence of safety devices and was a proximate cause of the injury.

## ISSUE V: EVIDENCE

Plaintiff argues the trial court erred in excluding from evidence owner's manuals for A.F.E.'s 1969, 1970, and 1971 dryers. He contends these manuals show A.F.E.'s knowledge of the operational functions of the dryer in question, as well as the inclusion of a bell-light-siren warning system on the 1969 and 1970 dryers. Any alleged error in the exclusion of these manuals, however, has not been demonstrated

by plaintiff who did not offer to prove to the trial court, and who did not show this court, how the 1969, 1970, and 1971 manuals demonstrated any knowledge on the part of A.F.E. that was not already demonstrated by the 1967 manual. The trial court would not err in, and plaintiff would not be prejudiced by, the exclusion of merely cumulative evidence. *Koehler v. Harmon, Receiver*, (1912) 52 Ind.App. 315, 98 N.E. 1009. Also, our perusal of the 1969 and 1970 manuals reveals that the bell-light-siren warning system was designed not to signal that the dryer would soon activate auxiliary equipment, but to signal a power interruption to the dryer.

Lastly, plaintiff contends the trial court abused its discretion in not allowing plaintiff's expert witness to give his opinions that the design of the dryer was "dangerous and hazardous to a user" and "defective." The record indicates the trial court excluded these opinions because whether the dryer was in a defective condition unreasonably dangerous was an ultimate fact in issue and, thus, a question for the jury. Expert opinions on ultimate facts are no longer objectionable on the basis that they invade the province of the jury. *See DeVaney v. State*, (1972) 259 Ind. 483, 288 N.E.2d 732; *Adoption of Lockmondy*, (1976) Ind. App., 343 N.E.2d 793.

For the reasons stated, we order this cause reversed and direct the trial court to grant a new trial.

Reversed.

ROBERTSON, P. J., and RATLIFF, J., concur.