Ted SHANKS and Roger Shanks, natural
Guardian of Ted Shanks,
Plaintiff-Appellant,

v.

A.F.E. INDUSTRIES, INC.,
Defendant-Appellee.

No. 281S47.

Supreme Court of Indiana.

Feb. 23, 1981.

Rehearing Denied April 28, 1981.

Thomas N. Mote, G. Terrence Coriden, Lawson, Pushor, Mote & Coriden, Columbus, for plaintiff-appellant.

William C. Moore, Steckbeck, Moore & Cohen, Indianapolis, Sharpnack, Bigley, David & Rumple, Columbus, for defendant-appellee.

PIVARNIK, Justice.

This cause comes to us on appellee's petition to transfer from the First District Court of Appeals. At the close of plaintiff Shanks' evidence at trial, the trial court entered judgment on the evidence for defendant-appellees A.F.E. Industries, Inc. The Court of Appeals reversed the trial court and ordered a new trial, finding that the question of the feasibility of safety devices that would warn users or bystanders that an elevator leg was about to be activated was of sufficient probative value for the trier of fact to determine the ultimate question of whether the product was defective and unreasonably dangerous. *Shanks v. A.F.E. Industries, Inc.*, (1980) Ind. App., 403 N.E.2d 849. We find that the

trial court properly entered judgment on the evidence; accordingly we grant transfer and vacate the opinion of the Court of Appeals.

The facts and circumstances of this cause were well enumerated in the Court of Appeals opinion, and we adopt that portion of the opinion and incorporate it herein as follows:

"Plaintiff-appellant Ted Shanks appeals a judgment on the evidence for defendant-appellee A.F.E. Industries, Inc. (A.F.E.), entered at the close of the plaintiff's evidence by the Bartholomew Circuit Court.

Two issues are raised for our review:

I.  Whether the judgment is contrary to the law and the evidence; and

II.  Whether the trial court erroneously excluded certain exhibits and testimony.

.   .   .   .   .

In the fall of 1973, Ted Shanks was enrolled in a high school agricultural cooperative program, a part of which consisted of employment at Grammer Elevator, Inc. (Grammer), a commercial feed mill and grain elevator.  He was repairing an elevator leg which was connected to an automatic grain dryer manufactured by A.F.E. when the elevator leg began to move, severely and permanently injuring his left leg.

Plaintiff filed suit against A.F.E. for the personal injuries suffered by him under the theories of breach of implied warranty and strict liability in tort under § 402A of the Restatement (Second) of Torts (1965).  The trial court granted A.F.E.'s motion for judgment on the evidence at the close of the plaintiff's evidence under Ind. Rules of Procedure, Trial Rule 50(A)(1) and entered judgment for A.F.E.  Although plaintiff raised allegations of error relating to the theory of breach of implied warranty in his motion to correct errors, he has not argued these allegations on appeal and has waived them under Ind. Rules of Procedure, Appellate Rule 8.3(A)(7).

The rule in Indiana with respect to a motion for judgment on the evidence pursuant to T.R. 50 is that such motion may properly be granted only if there is no substantial evidence or reasonable inferences derived therefrom supporting an essential element of the claim, a complete failure of proof, and that in considering such motion, the trial court must consider only the evidence and reasonable inferences therefrom most favorable to the non-moving party.  *Ortho Pharmaceutical Corp. v. Chapman,* (1979) Ind.App., 388 N.E.2d 541; *Gregory v. White Truck & Equipment Co., Inc.,* (1975) 163 Ind.App. 240, 323 N.E.2d 280.

Restatement (Second) of Torts, § 402A has been expressly adopted as the law of Indiana, and is as follows:

'(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it was sold.

(2) The rule stated in the Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.'

A prima facie case is established by evidence of 1) a purchase 2) from a seller engaged in the business of selling such a product 3) of a defective product 4) and the product reached the user or consumer without substantial change in its condition and 5) the product caused physical harm to the user or consumer because of the defect.  *Ayr-Way Stores, Inc., v. Chitwood,* (1973) 261 Ind. 86, 300 N.E.2d 335; *Ortho Pharmaceutical Corp., supra.*

## FACTS

A proper understanding of the case requires a lengthy recital of the evidence

presented by the plaintiff. We consider only that evidence which was most favorable to the plaintiff. Grammer, a firm engaged in the business of buying grain from farmers and reselling it on the market, purchased the grain dryer in question in 1967. Charles Whittington, part owner and manager of Grammer, purchased the dryer from A.F.E. through a distributor in Michigan. Whittington went to Zurich, Illinois, with his own truck, and transported the dryer to Grammer. It was accompanied by an owner's manual. The dryer had a capability which was stated in the manual to function manually or automatically in conjunction with other auxiliary equipment, which auxiliary equipment could assume a variety of forms and functions, depending upon the desires of the owner. The dryer was at first used manually at an old elevator complex.

In 1969, Grammer, through the efforts of Whittington, built an entirely new grain elevator complex. Whittington wanted an entirely automatic grain drying system that 'would run by itself as much as possible.' Whittington, a Purdue University agricultural graduate experienced in grain handling and farm operations, approached four firms and asked them to submit plans and designs for the desired complex. He selected the plans and design of Barnes Construction Company (Barnes) and awarded it the contract. Barnes built the complex, but did not design or install any electrical wiring or electrical equipment. The complex, as built, consisted of a pit into which grain was dumped from the farm trucks, an elevator leg, several cylindrical metal storage bins, a central shed, the necessary augers, electric motors, and machinery, and the A.F.E. dryer which was moved from its prior location to the new complex.

Grammer, through Whittington, employed the firm of Auto Electric to design the electrical functions and wire the entire complex. The entire complex was operated electrically. Auto Electric created the design, furnished all the electrical equipment in the complex, and installed such equipment. The end result of the installation of the electrical fixtures, as relevant here, was

the creation of a central control shed containing all switches, boxes, fuses, breakers, and controls which operated every piece of machinery and every electric motor in the complex, including the dryer, augers, and elevator leg.

The planning and the construction of the complex and the design and installation of the electrical fixtures were done only after close consultation with and approval by Whittington. Auto Electric did no wiring whatsoever internally within the dryer. It merely wired the dryer into the system in compliance with the recommendations contained in the manual furnished by A.F.E. by attaching its wires to terminals on the dryer.

Upon completion, the drying operation worked automatically in four phases. In the first phase, an auger brought wet grain from a wet grain storage bin to the top of the dryer and filled it. The second phase was the drying of the grain. This was accomplished by heat, generated by a fuel-fired heating device in the dryer, forced by means of fans through and around the grain. The third phase was the cooling phase during which the grain was cooled with the aid of fans. The fourth phase was the unload phase. Here the dried grain was removed from the dryer by means of an auger in the bottom of the dryer and was, by means of yet another auger, transported to the base of the elevator leg which was located close to the dryer. The elevator leg then elevated the grain to a point high over the complex of bins and dumped it into a pipe which carried the grain to the selected bin for storage. The four-phase cycle was then repeated.

The entire operation was automatic. The dryer, inherently and as designed and manufactured by A.F.E., had a system · of switches and timers on it that would activate, time, and control the four-phase drying cycle according to predetermined settings. The auxiliary equipment, consisting of the storage bins, augers to transport the dried grain to the elevator leg, and the leg, was not manufactured nor installed by

A.F.E. However, the dryer was designed, manufactured, advertised, and sold with the contemplation and representation that it could be used in conjunction with such equipment. Such was anticipated by A.F.E. in its owner's manual. Further, the controls installed in the dryer by A.F.E. activated and governed all phases described above and controlled the auxiliary equipment. The internal controls of the dryer were wired by means of its terminals through the central control shed, and the dryer could be turned off and on from the central control shed.

When the dryer switch in the central control shed was in an 'off' position or when the dryer was in a load, dry, or cool cycle, the elevator leg could be operated independently by means of its own switch. This was necessary because, in addition to drying, the elevator leg was used in most functions in the complex where grain was handled whether the grain was to be dried or not. However, even when the elevator leg switch was in an 'off' position and the dryer commenced its unload phase, the dryer, through its internal automatic control devices which were wired through the central control shed to the elevator leg, activated the elevator leg. This was necessary for if the dryer began its unload phase and the elevator leg did not commence to operate simultaneously, there would accumulate a glut of grain at the base of the leg with resulting spillage. The elevator leg consisted of a tall metal housing inside of which ran an endless revolving chain with buckets attached to it. The buckets scooped up grain from a pit at the base of the leg brought to that point by augers, carried the grain to the top of the leg, and dumped it into pipes where it descended to the selected bin for storage.

Whittington, being instrumental in the design and construction of the complex, understood its operation thoroughly from the beginning and, as relevant here, understood that when the elevator leg switch was in an 'off' position, and the dryer was operating, and the dryer commenced its unload phase, the dryer's controls activated the elevator leg automatically.

Plaintiff, a 17-year-old boy, was an employee of Grammer. Whittington explained to him the general operation of the complex including the control shed and the switches, but told him to leave the dryer alone. Plaintiff did not know that the dryer's operation would activate the elevator leg automatically even if the elevator leg switch was in an 'off' position.

On this particular day a bucket was loose from the chain in the elevator leg and plaintiff volunteered to repair it. Whittington approved with the admonition that plaintiff turn everything off. It was necessary to rotate the defective bucket to an inspection door in the housing on the leg by power in order to effect repairs. This was accomplished by plaintiff's using the separate elevator leg switch and watching the door, which was the customary way. The defective bucket passed the inspection door slightly because of the inertial lag after power was cut by turning off the independent leg switch, and after turning the switch off, plaintiff attempted with his leg and the weight of his body to push the chain backward to place the defective bucket in front of the inspection door, which technique was also customary. At this point the dryer commenced its unload phase, thereby automatically activating the elevator leg, and plaintiff was severely injured."

■ Plaintiff Shanks argues that the lack of warning to the user that the elevator leg was to be automatically activated during the "unload" phase of the dryer rendered the dryer unreasonably dangerous within the contemplation of § 402A. *See* Ind.Code § 34–4–20A–1 *et seq.* (Burns Supp.1980) (codifying § 402A). In other words, he asserts, there was a defect in the operation of the dryer because it did not have a safety device in the form of a bell or light which would indicate that the elevator was about to activate, and thereby give a worker time to get out of the way of the moving parts. On the other hand, A.F.E. contends the dryer was not defective. A.F.E. argues that the overall complex, in-

cluding the elevator leg, was designed and built by other manufacturers. The dryer perfectly performed its intended and designed functions. A.F.E. further asserts there was no hidden danger because the buyer, Whittington, knew all about the automatic nature and characteristics of the dryer and, in fact, had the complex built to utilize this feature and make the operation as automatic as possible.

As the Court of Appeals explained, A.F.E. neither designed nor built the complex. In addition, both parties acknowledge that the dryer operated exactly as it was intended to operate by A.F.E. and Whittington. No manufacturing flaw is involved, nor is there a design flaw involved as to the dryer's operating characteristics. The automatic feature of the dryer was contemplated by both the seller and the buyer; the very purpose of the automatic operation was to move the grain through the transfer, drying and storage processes without the necessity of an employee monitoring each phase, and thereby facilitate a more efficient operation of the complex. The system functioned very well in that regard. As the facts indicate, Shanks' employer, Grammer, through Whittington, had the complex designed in that manner and with this feature in mind. Whittington selected the plan and design of Barnes Construction Company, and awarded the contract to Barnes to build the complex in the fashion Shanks found it when he was injured. The firm of Auto Electric designed the overall electrical system and wired the entire complex to suit Whittington's desires. This included wiring the dryer into the overall system. Whittington had extensive knowledge of these operations and therefore was aware of any necessity for warning devices to be used at any stage of the operation. Likewise, had he thought it advisable, he had the opportunity to have such warning features incorporated into the design and operation of the overall complex. Grammer, through Whittington, is also the party responsible for hiring Shanks, instructing him on the operation of this equipment, and dispatching him on the job he undertook which resulted in his injuries.

There is no showing here that A.F.E. failed to give adequate warnings of any dangers in the operation of this dryer that proximately caused the injuries to Shanks. In *Ortho Pharmaceutical Corp. v. Chapman,* (1979) Ind.App., 388 N.E.2d 541, the Court of Appeals held that a defect can be found from a complete absence of warnings or from inadequate warnings and that the test of the adequacy of a warning is whether it was reasonable under the circumstances. In *Burton v. L. O. Smith Foundry Products Co.* (7th Cir. 1976) 529 F.2d 108, the Seventh Circuit Court of Appeals held that a product may be defective because of manufacturing flaws, defective design, or failure to supply complete information about the product's dangers. In that case, the Court was applying Indiana law in a diversity jurisdiction case, and addressed itself to a situation similar to the one we face here. The Court reasoned that the defendant manufacturer had no control over the work space, the machine or the hiring, instruction or placement of personnel. Thus, the defendant's duty to warn and instruct the ultimate user was satisfied when the manufacturer adequately warned or instructed those employees of the purchaser who were responsible for receiving the product. It was the responsibility of those persons to pose warnings and take other precautions relative to the deceased, who was the ultimate user.

In the case before us, it is apparent that Whittington was not ignorant of any of the facts concerning the operations and dangers inherent in the functions of the dryer. As the Court of Appeals stated in its opinion: "He perfectly well knew the characteristics of the dryer, wanted it that way, ordered it that way, and caused it to be installed in the new complex to work automatically in conjunction with the leg. No additional warning or literature that could be furnished to him by A.F.E. at the time of the sale could have improved upon his understanding of the characteristics of the machine." Ind.App., 403 N.E.2d at 857. Therefore, the Court of Appeals properly found here that Shanks' theory concerning

the adequacy of instruction and warnings is "untenable." *Id.*

■ The Court of Appeals erred on the issue relating to A.F.E.'s duty to equip the dryer with warning devices. Because the dryer could be used as a component in a multifaceted complex such as the one created here by Whittington, to allow a jury to examine, in retrospect, the wisdom of A.F.E.'s incorporating some lights or bells into the dryer is to permit nothing more than speculation. A complex operation such as this one could have taken many forms, depending on the needs of the owner and the imagination of the designer. Here, Grammer, through Whittington, solicited four different plans before finally selecting the one to be used. The need for any warning devices, and the circumstances surrounding their use, would, of course, depend upon the operation of the whole complex, based upon the features of its design. Thus, because the dryer could be incorporated into a variety of grain handling systems, the desirability or need for such devices could be determined only *after* any given type of complex had been chosen and created. Of course, A.F.E. here had no way of knowing exactly how Whittington would employ its dryer and, hence, the specific context in which such warning devices could or should be used relative to the operation of an elevator leg. By contrast, Grammer, through Whittington, had extensive knowledge of these factors, not only concerning the dryer, but concerning the entire grain handling operation.

In addition, once the design for the entire system was completed and a decision made by Grammer to incorporate warning devices, it would further be necessary for any employee using the complex to be instructed as to what the lights or bells meant. The employee would have to be told that the flashing of lights or the ringing of bells signalled the movement of some parts of the system, possibly including the elevator leg. Fundamentally, that responsibility lay with Grammer, as the creator of the complex and as Shanks' employer. *Burton v. L. O. Smith Foundry Products Co., supra.*

Again, A.F.E. had no knowledge of or control over these decisions and therefore the instructions or warnings which possibly should have been given to Grammer's employees. Thus, further speculation arises as to what A.F.E. should have known regarding how many lights or bells would be necessary, how large or bright or loud they should be, and their location, given the several different ways A.F.E.'s dryer might have been put to use in the system.

Finally, this system included an electrical switch that deactivated the entire complex, including the dryer. In spite of Whittington's instructions to shut everything off, this particular switch was not turned off; the dryer continued to function until the drying cycle was completed, and then, as it was supposed to do, automatically activated the elevator leg on which Shanks was working.

Unquestionably, the facts and evidence supporting Shanks' theory reveal the development of a situation which was especially unforeseeable to A.F.E. *Cf. Gilbert v. Stone City Constr. Corp.* (1976) 171 Ind.App. 418, 357 N.E.2d 738. Since there was no probative evidence at the close of the plaintiff's case that any defect existing in A.F.E.'s dryer due to a lack of warning devices in that product proximately caused or contributed to cause the injuries to Shanks, the trial court properly granted A.F.E.'s motion for judgment on the evidence. Appellee's petition to transfer is granted, the opinion of the Court of Appeals is vacated, and the judgment of the trial court is affirmed.

GIVAN, C. J., and HUNTER and PRENTICE, JJ., concur.

DeBRULER, J., dissents with opinion.

DeBRULER, Justice, dissenting.

The grain drying machine manufactured by defendant-appellee was designed and constructed so as to operate in conjunction with auxiliary loading and unloading equipment. In fact, the drying machine is useless unless operated in tandem with such other equipment, as without it, it would simply dump grain out onto the ground.

The machine is therefore equipped with an electrical control box which is designed to govern the operation of auxiliary equipment. The machine and its auxiliary equipment can be operated in either an automatic or manual mode. The design of the circuitry in this control box is such that when auxiliary unloading equipment such as the elevator which came on without warning and cut off the plaintiff's leg is connected to proscribed terminals on the box, and the drying machine is being operated in the automatic mode, a signal is sent out to the auxiliary equipment to start up without also sending out a signal that the machine is in the automatic mode. Whether the absence of a warning device of this sort rendered the drying machine defective as unreasonably dangerous, and whether plaintiff who was operating an auxiliary elevator when it suddenly and unexpectedly started up was within the class of persons that the defendant manufacturer should have reasonably foreseen as being subject to the harm were questions which should have been submitted to the jury.

I would therefore reverse and remand for a new trial.