**Shirley BLACK, et al.,
Plaintiffs-Appellants,**

v.

**HENRY PRATT COMPANY and Amsted
Industries, Defendants-Appellees.**

**Nos. 84–2983, 84–2984, 84–3023
and 84–3031.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 11, 1985.
Decided Dec. 11, 1985.

William J. Stevens, Foss, Schuman & Drake, Chicago, Ill., for plaintiffs-appellants.

Jon F. Schmoll, Spangler, Jennings, Spangler & Dougherty, Merrillville, Ind., for defendants-appellees.

Before WOOD, COFFEY and RIPPLE, Circuit Judges.

COFFEY, Circuit Judge.

Plaintiffs appeal the district court's grant of summary judgment in favor of defendants Henry Pratt Company and Amsted Industries on the grounds that the plaintiffs' products liability actions are barred pursuant to Section 5 of the Indiana Product Liability Act, Indiana Code § 33–1–1.5–5. We affirm.

## I

Jones & Laughlin Steel Company ("J & L") operates a steel mill in East Chicago, Indiana. In 1967, defendant Henry Pratt Company ("Pratt") (now a division of Amsted Industries) received a purchase order from Chicago Tube and Iron Co. for three 48″ R1 rubber seated butterfly gas shut off valves to be delivered to the Youngstown Sheet & Tube Co. ("Youngstown") (predecessor of J & L) East Chicago Mill. The R1 valve was a standard item in the Pratt catalog, designed and assembled by Pratt, comprised of a 48″ diameter steel cylinder with a flat metal disk, or butterfly, that fits inside the steel cylinder. During the operational cycle of the valve, when the disk is perpendicular to the length of the cylinder and is resting against the cylinder walls, the valve is fully closed. When the disk is parallel to the length of the cylinder, the valve is fully open. The valve disk is attached to a valve shaft spanning the diameter of the cylinder and seated in bearings in the cylinder wall. The valve is opened and closed by rotating the valve shaft by means of a manual chainwheel operator, consisting of a twenty foot loop of chain suspended from a chainwheel (sprocket) mounted perpendicular to the valve shaft. When the chain is activated, the chainwheel rotates, supplying force to the gears in the operator (the mechanism in the valve assembly that transfers force from the chainwheel to the valve shaft), which in turn rotates the valve shaft.

In October 1967 Pratt delivered the three R1 valves to Youngstown during the fourth reline (overhaul) of the No. 3 blast furnace. Youngstown installed one of the valves in the gas downleg (a pipeline feeding washed blast furnace gas to the stove) to the No. 32 stove of the No. 3 blast furnace. In normal operation of the furnace, the R1 valve was opened and closed on the average of eight times in a twenty-four hour period, and fresh air for combustion in the stove was provided by an electric motor driven fan manufactured by the Westinghouse Electric Corporation. In the event of a failure in the electric fan, the design of the stove was such that the R1 valve in the gas downleg would provide the only means of shut-off of the flow of washed blast furnace gas and prevent the escape of the deadly gas containing 27.5% carbon monoxide into the area surrounding the furnace.

According to the record, the Henry Pratt Co. was neither involved in the installation of the valves, much less did it ever perform any repair work, modification, or replacement work on any of the three R1 valves delivered to Youngstown Sheet & Tube Company in 1967. The only contact between Pratt and Youngstown or Jones & Laughlin Steel after the delivery of the valves in 1967 involved the purchase and sale of replacement parts for the valve bodies in 1972, 1973, and 1978. Before purchasing the replacement parts, a J & L employee consulted with a Pratt engineer regarding the appropriate seat material for the Pratt valves (the seat material provides a seal between the valve butterfly and valve walls). In 1972, J & L purchased three valve seats and cement, six bearings, and three sets of packing; in 1973, three valve seats; and in 1978 one seat retaining segment and seat retaining segment screws. The replacement parts purchased in 1972 and 1973 were installed by a contractor, John Mohr & Sons, during the fifth reline in 1973. The record fails to reflect whether the replacement parts purchased in 1978 were in fact ever installed, or if they were in fact installed, who installed them.

On December 28, 1979, the combustion fan motor on the No. 32 stove of the No. 3 blast furnace failed, and washed blast furnace gas containing carbon monoxide began escaping from the stove into the immediate surrounding area at a rate of 30,000 cubic feet per minute. The "stove man," Al Lovincy, summoned the general foreman, Allen Black, and the two succeeded in partially closing the R1 shut off valve in the gas downleg by pulling on the chain attached to the operator. When Gary Hoffman, the blower foreman, arrived on the scene shortly thereafter, he tried to complete closing the valve by pulling on the chain. Instead of closing the valve, Hoffman pulled the chain off the chainwheel. While attempting to close the valve, Hoffman was overcome by carbon monoxide. Black attempted to rescue Hoffman, but was also overcome. Donald Fields, Ezell Goins, Ben Harris, and Frederick DeHoyos all joined together to assist in the rescue of their fellow workers Hoffman and Black, and were also overcome by carbon monoxide. All six died of asphyxiation as a result of the high level of carbon monoxide released from the No. 3 blast furnace.

Shortly thereafter, in an attempt to halt the flow of carbon monoxide, Joseph Hudnall isolated the No. 32 stove and cleared the carbon monoxide from the system and the area immediately surrounding the unit. Once the area was safe, Hudnall inspected the R1 gas shut off valve, and after replacing the chain back on the chainwheel and turning the chainwheel so the valve was in the closed position, he noted that the valve was in fact closed and properly seated. J & L continued to use the same Pratt valve in the gas downleg to the No. 32 stove following the accident without incident until the blast furnace was redesigned and rebuilt in 1981.

The plaintiffs, the administratrixes of the six J & L employees killed in the December 1979 mishap, filed four separate diversity actions in the United States District Court for the Northern District of Indiana. Each complaint named as defendants John Mohr & Sons, Westinghouse Electric Corporation, Henry Pratt Co., Amsted Industries, American Chain Co., Inc., and ACCO Industries. (American Chain Co., Inc. and ACCO Industries allegedly designed and manufactured the chain and sprocket incorporated in the chainwheel operator of the Pratt R1 valve.) The plaintiffs' claims were based in negligence, strict liability in tort, breach of express and implied warranty, and willful and wanton conduct. The district court consolidated the four cases for purposes of discovery and pretrial motions. Defendants Pratt, Amsted, American Chain Co., ACCO Industries, and Westinghouse Electric Corp. filed motions for summary judgment in each case on the grounds that the plaintiffs' actions were barred by the 10-year statute of limitations set forth in Section 5 of the Indiana Product Liability Act, Indiana Code § 33-1-1.5-5. The district court granted the motions for summary judgment, noting that Westinghouse delivered the fan motor to J & L in 1963, and the valve, including the chain and chainwheel assembly, was delivered to J & L in 1967, while the accident occurred in December 1979. The district court specifically noted that the accident was caused by the chain coming off the chainwheel or other problems involving the chain mechanism itself, and that the replacement parts—bearings, seats, packing and glue—furnished in 1972, 1973, and 1978 had no bearing whatsoever on the accident. Since the plaintiffs' actions were not filed until 1981, more than ten years after delivery of the allegedly defective valves, including the chain and chain mechanism, the district court concluded that the Indiana statute of limitations barred the plaintiffs' recovery. The district court also determined that despite the fact that the actions continued against John Mohr & Sons, there existed no just reason for delaying the entry of final judgments in favor of the other defendants. The court thus directed that a final judgment of dismissal be entered with respect to each of the defendants with the exception of John Mohr & Sons pursuant to Fed.R.Civ.P. 54(b). The plaintiffs appeal

the entry of summary judgment in favor of defendants Pratt and Amsted.

## II

The appellants contend that the district court erred in granting summary judgment because there exists a genuine issue of material fact: "[whether] the supplying of parts essential for the operation of [the R1] valve without warning of the dangers posed by that valve's use render those parts dangerous." According to the appellants, "The particular application of the seats and bearings in the valve that killed the men was foreseeable. PRATT could foresee that these seats and bearings would make an otherwise inoperable 48 inch butterfly valve work." The appellants further argue:

"In supplying the essential replacement parts for the valve in 1972 and 1973, PRATT failed to warn J&L, Mohr or anybody of the foreseeable dangers of making that valve work. The supplying of essential parts without warning rendered those particular seats and bearings dangerous and defective. When PRATT made its deliveries in 1972 and 1973 it did not warn anybody of the need to have clear directions on the chain for closing the valve, did not warn of the need for a more visible indicator of the valve position, did not warn of the need for a chain guide or tension device to keep the chain on the sprocket wheel and did not warn of the need for a remote controlled fail safe back up gas cut off. The lack of these warnings made the valve seat and valve bearings unreasonably dangerous when supplied."

Since the replacement parts that were actually installed were delivered in 1972 and 1973, and the appellants' actions were commenced in 1981, within ten years of the delivery of the parts, the appellants contend the actions were commenced within the 10-year statutory limitation period set forth in the Indiana Product Liability Act and should not be barred.

Pratt and Amsted counter that the warnings now advanced by the appellants are concerned with the same alleged dangers that were allegedly present in the original valve delivered in 1967, not with any dangers inherent in the bearings and the seats. Pratt and Amsted note the absence of any change in the essential condition of the valve as originally designed, manufactured, and supplied in 1967, the absence of any connection between the warning proposed by appellants and any defect in the replacement parts themselves, and the absence of any causal connection between the replacement parts and the alleged malfunction of the chain wheel mechanism. According to Pratt and Amsted, the plaintiffs' claim is essentially that Pratt and Amsted, the designer, manufacturer, and supplier owed a "continuing duty to warn [J & L] of the same alleged dangers associated with the use of the valve as originally supplied, and not of any new dangers that were created by the supply and installation of the replacement parts." Pratt and Amsted argue that the Supreme Court of Indiana rejected a similar claim in *Dague v. Piper Aircraft Corp.*, 275 Ind. 520, 418 N.E.2d 207 (1981), where the plaintiff contended that "Piper Aircraft's alleged negligence [in failing to warn users of those dangerous features of its product of which it had knowledge], began during the ten-year time limit and was continuing, and the statute of limitations [did] not bar an action grounded on this theory." 418 N.E.2d at 211.

In this summary judgment action, we note that judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c); *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). "[I]n determining whether factual issues exist, a reviewing court must view all the evidence in the light most favorable to the non-moving party." *Collins v. American Optometric Association*, 693 F.2d 636, 639 (7th Cir.1982); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "[W]here no factual disputes are present, or where the undisputed facts

demonstrate that one party is entitled to judgment as a matter of law, summary judgment in favor of that party is entirely appropriate." *Collins*, 693 F.2d at 639.

Section 5 of the Indiana Product Liability Act, Ind.Code § 33–1–1.5–5, provides in pertinent part:

"[A]ny product liability action in which the theory of liability is negligence or strict liability in tort must be commenced within two [2] years after the cause of action accrues or within ten [10] years after the delivery of the product to the initial user or consumer; except that, if the cause of action accrues more than eight [8] years but not more than ten [10] after that initial delivery, the action may be commenced at any time within two [2] years after the cause of action accrues."

In *Dague v. Piper Aircraft Corp.*, 275 Ind. 520, 418 N.E.2d 207 (1981), the Supreme Court construed Section 5 of the Indiana Product Liability Act to require "that the action must be brought within two years after it accrues, but in any event within ten years after the product is first delivered to the initial user or consumer, unless the action accrues more than eight but less than ten years after the product's introduction into the stream of commerce." 418 N.E.2d at 210. The *Dague* court also held that "Irrespective of the defendant's continuing duty to warn of any latent defects of which it had knowledge, and its alleged continuing breach of that duty, ... plaintiffs cause of action for such negligence did not accrue until her decedent was harmed. This ... occurred more than 10 years after the plane was placed in the stream of commerce. For this reason, sections one and five of the act bar this cause of action." *Id.* at 212. The court held that the Product Liability Act expressly applies to all product liability actions sounding in tort, including those based on a theory of a failure to warn, and "the legislature clearly intended that *no* cause of action would exist on any such product liability action after ten years." *Id.* (emphasis in original).

Any claim by the appellants based upon Pratt's failure to provide warnings concern-

ing the need for clear directions on the proper use of the chain, the need for a more visible indicator of the valve position, the need of a chain guide or tension device, or the need for a remote controlled back-up valve when it delivered the R1 valve assembly in 1967 is clearly barred by Section 5 of the Indiana Product Liability Act since the accident in question occurred in 1979, more than ten years after the delivery of the valves to J & L. The appellants attempt to circumvent the statutory bar in asserting the unique argument that Pratt's failure to give the warnings referred to above when it sold replacement parts to Jones & Laughlin in 1972 and 1973 "made the valve seats and valve bearings unreasonably dangerous when supplied." The appellants thus argue that their actions are not barred by the Indiana Product Liability Act since Pratt sold the replacement parts to J & L within ten years of the accident and the commencement of the appellants' action in the district court. Thus, we must determine whether Pratt's sale of the replacement parts to J & L in 1972 and 1973 without the suggested warnings rendered those replacement parts unreasonably dangerous and thus defective under Indiana law. If the replacement parts sold in 1972 and 1973 are determined to be unreasonably dangerous and defective and were the proximate cause of the injuries complained of, then the appellants' complaints were filed well within the limitations period of the Indiana Product Liability Act; if not determined to be unreasonably dangerous and defective, then the appellants' cause of actions accrued when the R1 valve assemblies were delivered in 1967, and the actions are consequently barred by Section 5 of the Indiana Product Liability Act.

"[T]he manufacturer of a component is liable under § 402A [of the Restatement (Second) of Torts] for injuries to an ultimate user or consumer for a defect where the defective component renders the product in which the component is incorporated unreasonably dangerous." *Shanks v. A.F.E. Industries, Inc.*, 403 N.E.2d 849, 856 (Ind.Ct.App.1980). Also the appellants must show "that the defect was the cause

which, in natural and continuous sequence, unbroken by any efficient intervening cause, produced the result complained of and without which the result would not have occurred." *Craven v. Niagra Machine & Tool Works, Inc.,* 417 N.E.2d 1165, 1170 (Ind.Ct.App.1981). It is uncontradicted that following the accident on December 28, 1979, once the chain was properly replaced on the chainwheel, the valve operated and seated properly. The bearings, seats, and packing functioned exactly as designed; it was only the malfunction of the chain mechanism that prevented the valve from closing on December 28, 1979, allowing the carbon monoxide gas to escape in the area surrounding the blast furnace. In each of the cases cited by the appellants the court imposed liability upon the manufacturer of a component only where the component was in fact unreasonably dangerous or defective, and where the component was the cause of the injury complained of. Thus, the appellants have failed to provide this court with any authority to support the proposition that the sale of components—replacement parts—totally unrelated to the alleged defect or unreasonably dangerous condition existing in the original product constitutes the sale of an unreasonably dangerous and defective product within the meaning of § 402A. We are unable to comprehend how the sale of the valve bearings, seats, and packing in any manner, shape, or form contributed to the alleged unreasonably dangerous condition of the R1 valve when it is uncontradicted that the malfunction of the valve was related solely to the operation of the chain mechanism.

The appellants argue nevertheless that "PRATT could foresee that the seats and bearings would make an otherwise inoperable 48 inch butterfly valve work," and that "PRATT could foresee that the seats and bearings would permit the chain, sprocket wheel and valve position indicator to work." The appellants conclude that, "The supplying of essential parts without warning rendered those particular seats and bearings dangerous and defective," supporting a cause of action for Pratt's

failure to warn. The Restatement (Second) of Torts provides that a manufacturer has a duty to give warnings if the manufacturer: "(a) knows or has reason to know that the [product] is or is likely to be dangerous for the use for which it is supplied, and (b) has no reason to believe that those for whose use the [product] is supplied will realize its dangerous condition...." Restatement (Second) of Torts § 388; *see also American Optical Company v. Weidenhamer,* 457 N.E.2d 181, 187 (Ind.1983). Thus, Pratt had a duty to issue warnings when it sold the replacement parts in 1972, 1973, and 1978 *only if* the valve bearings, seats, and packings were in fact defective and thus dangerous for the use for which they were supplied. "[There is no duty to warn] with respect to a product which is, as a matter of fact, not dangerous." *American Optical,* 457 N.E.2d at 187 (quoting 63 Am.Jur.2d 59, Products Liability § 50.).

As discussed above, the valve bearings, seats, and packing at all times functioned as designed, and when the chain mechanism malfunction was corrected, the valve completely closed and properly seated. As the district court concluded, the cause of the accident was unrelated to the bearings, seats, or packing, but "relate[d] to the chain coming off the chainwheel or questions concerning the integrity of the chain mechanism itself." The replacement parts sold to J & L in 1972 and 1973 were not defective and therefore not dangerous in themselves and were not in any way related to the functioning of the chain mechanism controlling the valve. Thus, the replacement parts were not the cause of the valve malfunction in the December 1979 accident and therefore Pratt had no duty to give any warning upon the sale of these parts to J & L. Without such a duty, the failure of Pratt to give any warnings upon the sale of these items to J & L could not conceivably render the replacement parts unreasonably defective and dangerous within the meaning of § 402A of the Restatement as construed in Indiana. Since the replacement parts sold in 1972 and 1973 required no warning and were not unrea-

sonably dangerous and defective and since the replacement parts were not related to the cause of the fatal accident, the plaintiffs have no cause of action against Pratt or Amsted. Any possible cause of action would have to be based upon the alleged unreasonably dangerous and defective condition of the valve originally sold and delivered in 1967. But as noted above, any action based on the original delivery of the valves in 1967 is barred by the 10-year statute of limitations contained in Section 5 of the Indiana Product Liability Act as the accident occurred in 1979.

■ The above analysis is consistent with the Indiana Supreme Court's construction of Section 5 of the Indiana Product Liability Act in *Dague*. There, the Indiana Supreme Court noted, "The clear intention of the legislature in section five was to limit the time within which product liability actions can be brought." 418 N.E.2d at 210. The court also stated, "The Product Liability Act expressly applies to all product liability actions sounding in tort, including those based upon the theory of negligence, and the legislature clearly intended that *no* cause of action would exist on any such product liability theory after ten years." *Id.* at 212. (emphasis in original). Indiana has thus adopted an enlightened approach to the law of products liability in limiting a manufacturer's prospective liability. In contrast to Indiana's enlightened approach, other states have refused to enact a similar statute of limitations and thus subject manufacturers to open-ended product liability. Such open-ended liability places an unreasonable financial and insurance and non-competitive burden upon manufacturers who may be held liable for injuries caused by products manufactured and sold 40 to 50 years ago despite the constant improvement in design and increasingly hazard-proof nature of each succeeding product model within that 40 to 50 year period.

"It is beyond reason and good judgment to hold a manufacturer responsible for a duty of annually warning of safety hazards ..., when the product is ... 35 years old and outdated by some 20 newer models equipped with every imaginable safety innovation known in the state of the art. It would place an unreasonable duty upon these manufacturers if they were required to trace the ownership of each unit sold and warn annually of new safety improvements over a 35 year period."

*Kozlowski v. John E. Smith's Sons Co.*, 87 Wis.2d 882, 275 N.W.2d 915, 923–24 (1979). The holding urged by the appellants permitting the sale of replacement parts to extend or toll the statute of limitations would subject a manufacturer to virtually perpetual liability for unreasonably dangerous conditions and defects existing in a product as originally delivered. According to the appellants, each and every sale of a replacement part would require a manufacturer to warn the purchaser of any alleged dangerous conditions in the original product irrespective of when the product initially entered the stream of commerce. Since the Indiana legislature set a time limit for the commencement of products liability actions with its enactment of Section 5 of the Indiana Product Liability Act, we conclude that the sale of a replacement part (unrelated to the alleged defect or unreasonably dangerous condition) for the original product does not extend or toll the statute of limitations to subject a manufacturer to liability for injuries allegedly caused by a product that entered the stream of commerce more than 10 years prior to the injury. Thus, in the case at bar, where the original product (R1 valve) was sold and delivered to Youngstown in 1967 and the date of the accident is 1979, and in particular where the valve bearings, seats and packing Pratt delivered to J & L in 1972 and 1973 bore no relation to the alleged dangerous conditions of the R1 valve, we hold the Indiana legislature clearly intended to bar a cause of action of this nature.

### III

We agree with the district court's finding of no genuine issue of material fact and approve of the granting of the defendants Pratt and Amsted's motion for summary

judgment. Accordingly, the decision of the district court is AFFIRMED.

RIPPLE, Circuit Judge, concurring.

I join the opinion of the court in all respects except its statement as to the substantive merits of the Indiana Product Liability Act. On this matter, I prefer not to express an opinion.

In cases where our jurisdiction is based on diversity of citizenship, our task is to ascertain the content of state substantive law and to apply that law to the case before us. In many cases, although not in this one, that task is difficult enough. Absent federal constitutional impediment, it is not our place to take on the additional task of commenting—gratuitously—on the legislative policy choices of a state legislature. Our job is simply to apply those choices once made.