**Thomas DEL SIGNORE, et al., Plaintiffs,**

v.

**ASPHALT DRUM MIXERS, Defendant.**

**No. 1:00–CV–292.**

United States District Court, N.D. Indiana, Fort Wayne Division.

Jan. 7, 2002.

Richard McQuade, Swanton, OH, mediator.

Matthew C. Huffman, Gooding Huffman Kelley and Becker, Lima, OH, for plaintiffs.

Patrick G. Murphy, Michael H. Michmerhuizen, Barrett and McNagny, Fort Wayne, IN, for defendant.

## MEMORANDUM OF DECISION AND ORDER

COSBEY, United States Magistrate Judge.

### I. INTRODUCTION

This matter is before the Court[1] on the Motion for Summary Judgment filed by the Defendant, Asphalt Drum Mixers ("ADM"), on September 4, 2001.

On October 4, 2001, Thomas Del Signore ("Plaintiff") and Teri Del Signore (collectively "the Plaintiffs"), filed a response.

On October 18, 2001, ADM filed a reply which mentioned that the affidavit of the Plaintiff (Pl.'s Ex. 11) filed in opposition to the Motion for Summary Judgment should be stricken. The Court then ordered ADM to file a separate Motion to Strike directed to the Plaintiff's affidavit and they did so on October 29, 2001. The Plaintiff filed a response to the Motion to Strike on November 13, 2001, and ADM filed no reply.

After the briefing on the Motion for Summary Judgment the Court requested additional briefing on whether Count I of

---

1. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

the Plaintiff's complaint (the alleged negligent failure to warn claim) was subsumed by Count II (the alleged defective design claim), since the latter was allegedly brought under the Indiana Product Liability Act ("IPLA"), IND.CODE § 34–20–1–1, *et seq.* (*See* November 14, 2001 Order.) That resulted in simultaneously filed opening briefs on November 27, 2001, and two response briefs: the Plaintiffs' on December 10, 2001, and the Defendant's on December 11, 2001.

The record consists of various affidavits and deposition excerpts submitted by the parties, and this Court has jurisdiction based on diversity.[2] *See* 28 U.S.C. § 1332(a).

For the reasons hereinafter provided, the Motion to Strike will be DENIED and ADM's Motion for Summary Judgment will be GRANTED in part and DENIED in part.

## II. DEFENDANT'S MOTION TO STRIKE

ADM in its Motion to Strike contends that portions of the Plaintiff's affidavit is directly at odds with his prior deposition testimony and should therefore be stricken. *See Kalis v. Colgate–Palmolive Co.,* 231 F.3d 1049, 1055 (7th Cir.2000) (party should not be allowed to create a genuine issue of material fact by submitting an affidavit contradicting a prior deposition).

The Plaintiff, in his response (and a supplemental designation of evidence, containing pages 33–39 of the Plaintiff's deposition), contends that a close reading reveals there is no inconsistency between the two, and at most, the Plaintiff's affidavit simply clarifies or explains the earlier deposition testimony. The Plaintiff suggests that at least part of the problem is that his deposition was actually taken in the Plaintiff's pending worker's compensation case and not by counsel for ADM.

Indeed, an examination of the affidavit and deposition transcripts indicates that there is no direct conflict between the Plaintiff's earlier deposition testimony and his affidavit. While perhaps some of the earlier deposition testimony is a bit ambiguous on certain points (leaving room for the explanatory statements in the affidavit) on summary judgment these ambiguities must be construed in the Plaintiff's favor. *Aviles v. Cornell Forge Co.,* 183 F.3d 598, 602–03 (7th Cir.1999) (ambiguities in deposition must be resolved in favor of non-moving party on summary judgment). Therefore, the Motion to Strike will be denied. *Id.*

## III. THE PROCEDURAL AND FACTUAL BACKGROUND

### A. The Procedural Background

ADM, a manufacturer of stationary and portable asphalt plants, contracted with the Plaintiff's employer, Barlow Marketing, Inc. ("Barlow Marketing") for a promotional video to demonstrate how its products perform in the field. Barlow Marketing assigned one of its new employ-

---

**2.** We view this matter as an Indiana state trial court would, and apply the substantive law of the state of Indiana. *Jean v. Dugan,* 20 F.3d 255, 260 (7th Cir.1994) (citing *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)). Applying Indiana's choice of law rules, *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) leads to the conclusion that Indiana tort law should apply. *Hubbard Mfg. Co., Inc. v. Greeson,* 515 N.E.2d 1071, 1073 (Ind.1987). Moreover, neither side ar-

gued that the law of any other state controls, or provided notice under Fed.R.Civ.P. 44.1 that the law of Mexico applies. Accordingly, since the parties apparently agree, we follow the general rule and apply the law of the forum state. *Gould v. Artisoft, Inc.,* 1 F.3d 544, 549 n. 7 (7th Cir.1993) (citing *Coleman v. Ramada Hotel Operating Co.,* 933 F.2d 470, 473 (7th Cir.1991)); *Gonzalez v. Volvo of America Corp.,* 752 F.2d 295, 299 (7th Cir. 1985).

ees, the Plaintiff, the job of going to Mexico to videotape some of ADM's plants where he was met by ADM's Latin American sales manager, Rolando Haddad ("Haddad"). Haddad was to direct the Plaintiff's activities and they eventually arrived at an asphalt producing complex owned and operated by Abraham Gonzales Martel ("Martel") near the village of Queretaro, Mexico.[3] (Pl. dep. at 30.)

Martel's facility utilized a "wet wash pond" air cleaning system, essentially a hole in the ground which receives a mixture of hot water and fine dust, "particulate," during the asphalt making process. While video taping in the complex, the Plaintiff slipped and fell into the pond, sustaining severe injuries from the very hot water.

Count I of the complaint alleges some post-manufacture negligence on the part of ADM; that is, ADM, through Haddad, committed to take care of the Plaintiff in Mexico, but failed to warn him of the location, existence or potential hazard of the unmarked, unrestricted and essentially camouflaged pond on Martel's facility. (See Pl.'s Nov. 27, 2001 Br. at 4.) Under Count II,[4] brought under the IPLA, the Plaintiff alleges that ADM "designed" the location and dimensions of Martel's wet wash pond, and was therefore negligent in failing to design or specify the installation of some kind of railings, fences or warning signs around it. (See Pl.'s Nov. 27, 2001 Br. at 2; Pl.'s Dec. 10, 2001 Br. at 4.)[5]

In ADM's Motion for Summary Judgment it argues it neither had, nor assumed a duty to warn the Plaintiff about the pond (particularly since the pond was an "open and obvious" danger), it cannot be held liable under any theory of premises liability since it did not own or control Martel's property, and it cannot be liable on the product liability claim since it did not manufacture the pond or otherwise deliver a defective product to Martel.

The Plaintiff contends that ADM did have a duty to warn, perhaps by gratuitously assuming that duty, is liable on a theory of premises liability having effectively possessed or controlled Martel's property, the pond was not open and obvious because it was essentially camouflaged, and the product liability claim exists because the pond was a component of ADM's product, the asphalt plant. (See Pl.'s Nov. 27, 2001 Br. at 2–3.)

With these positions staked out, we recite the following facts as drawn from the record, viewed in a light most favorable to the Plaintiffs.

## B. The Factual Background

The Plaintiff, a relatively new employee of Barlow Marketing, was responsible for marketing communication projects. (Pl. dep. at 12; B. Barlow dep. I at 12.)

---

3. Martel was originally a defendant in this case, but was later dropped and now is a "nonparty." See IND.CODE §§ 34–6–2–88; 34–51–2–14. The remaining parties consented to the Magistrate judge, so jurisdiction exists pursuant to 28 U.S.C. § 636(c), as noted in note 1, supra.

4. Count III contains the derivative loss of consortium claim of the Plaintiff's wife, Teri Del Signore.

5. The Plaintiff in his First Amended Complaint clearly made allegations to bring the case under the IPLA. In fact, the Plaintiff's initial response brief maintains, "[Count II] of the Amended Complaint ... is a products liability claim." (See Pl.'s Oct. 4, 2001 Resp. Br. at 21.) This point was re-emphasized in the Plaintiff's response to the November 14, 2001 order. (See Pl.'s Nov. 27, 2001 Resp. Br. at 2, 4, 5.) However, in the conclusion of the December 10, 2001, response brief, the Plaintiff for the first time cryptically contends that Count II is "not necessarily a product liability action," and should also be viewed as a common law negligence claim.

Barlow Marketing does almost all of its work for construction equipment manufacturers, and was contacted by ADM to create a marketing video featuring its asphalt plants. (B. Barlow dep. I at 15, 33; B. Barlow dep. II at 2; Pl. dep. at 24; Dieffenbach dep. at 12–13.) Approximately one-half of ADM's sales are to Latin America. (Dieffenbach dep. at 11.)

The plants sold by ADM are designed to interface with either a Bag House filter system or a wet wash pond system, each of which filter the air within the plant.[6] (Haddad dep. at 22.) Martel's Queretaro facility was his second ADM wet wash plant. (Haddad dep. at 8, 49.)

During the wet wash process, the aggregate travels through the plant and is coated with liquid asphalt. (Parsons dep. at 5.) However, not all particulate sticks to the liquid asphalt and some falls into a duct where it is sprayed with hot water. (*Id.*) The hot water traps the particulate and eventually both empty into the wet wash pond. (*Id.;* Haddad dep. at 22–23.)

Typically the owner will construct one pond with three separate chambers. (Cardenas dep. at 8; Parsons dep. at 6; Haddad dep. at 31.) Most of the particulate settles to the bottom of the first chamber, and as the water flows into each successive chamber it becomes cleaner before recycling through the plant. (Cardenas dep. at 8; Parsons dep. at 14, 18; Haddad dep. at 49.) The water in the pond is hot, at least while the plant is in operation, but the temperature, which can range from ninety (90) to two hundred (200) degrees, depends on the size of the pond (i.e., the volume of water in the pond), and the rate of recirculation. (Cardenas dep at 8, 9; Dieffenbach dep. at 22.) However, after four or five hours of operation the water can reach one hundred and eighty degrees (180°). (Cardenas dep. at 8; Parsons dep. at 13.)

An ADM engineer will typically prepare a concrete foundation drawing for the customer and elevations depicting the layout of ADM's equipment, together with some suggested pond dimensions.[7] (Dieffenbach dep. at 5, 9; Haddad dep. at 13; Munro dep. at 4–5; Cardenas dep. at 12, 14; Parsons dep. at 14.) The foundation drawing offers only a footprint of ADM's plant and equipment so the customer will know how much space will be needed, and while ADM will advise the customer about the size of the pond, this ultimately depends on the size of the plant. (Haddad dep at 9, 13, 74; Cardenas dep. at 11–12; Munro dep at 4.) ADM will also tell the owner the maximum distance the pond can be from the plant, although it can be as far as a quarter of a mile away. (Haddad dep. at 13; Cardenas dep. at 19–20.) When the drawing is done, ADM will show it to the customer, as they did to Martel here (Munro dep. 6–8, 28), including a representation of what most ponds look like, and generally the customer will develop a roughly similar pond. (Cardenas dep. at 10–12.)

However, no two plants end up alike because in every instance the customer controls the placement, building and connection of the ponds to the plant, which means that the complex can be configured many different ways. (Cardenas dep. at 12, 15, 20; Haddad dep. at 9, 13, 16.)

---

6. The Bag House system, which does not use water, is not described in any detail, however, the wet wash system *is apparently simpler*, less expensive to operate, but not quite as efficient. (Haddad dep. at 22, 30; Munro dep at 17.) ADM's plants can be fitted with either system as specified by the customer. (Dieffenbach dep. at 22.)

7. However, the proposed pond itself is apparently not shown on the foundation layout, at least it does not appear on Martel's. *(See* Def.'s Supplemental Filing (Docket No. 65)).

Nevertheless, almost all wet wash pond plants have the same basic layout in that they are co-located with either a pond or another water source, such as a river. (Haddad dep. at 46.) However, because the owner may already have a quarry that needs to be accommodated on his site, or because he must provide for vehicle ingress and egress, the existing terrain also contributes to how the plant complex is laid out. (Haddad dep. at 13.) Even more importantly, the pond's location is ultimately driven by what local water sources are present. (Cardenas dep. at 14, 20.) All these variables mean that ADM does not get involved in telling the customer where to put a pond, let alone how it should be guarded. (Dieffenbach dep. at 20; Munro dep. at 19, 21, 28; Cardenas dep. at 14.)

After the customer sets up the plant, ADM sends customer operation manuals and service technicians for the start up; so, when ADM's service technician arrived at Martel's plant, the pond was already in place. (Dieffenbach dep. at 7–8; Parsons dep. at 3, 9, 14; Haddad dep. at 9.)

The Plaintiff's instructions from Barlow Marketing were for him to shoot the video according to ADM's directions. (Pl. dep. at 14.) The Plaintiff had never videotaped an industrial site before and had no construction industry background. (Pl.aff.¶ 2) However, to prepare for his trip to Mexico, the Plaintiff toured a Fort Wayne asphalt plant, but it was a Bag House plant and had no pond. (Bruce Barlow dep. I at 27–28; Bruce Barlow dep. II at 9–10; Pl. aff. ¶ 6; Dieffenbach dep. at 16.) At about the same time the Plaintiff was given some ADM plant literature, including information on wet wash ponds, but it is not clear whether he read the material. (Barlow dep. II at 12–13; Pl. aff. ¶ 5.) In short, the Plaintiff claims that when he went to Mexico he did not know that some portable asphalt plants had ponds. (Pl.aff. ¶ 5.)

Once the Plaintiff arrived in Mexico he was met by Haddad. (Pl. dep. at 26–29; Haddad dep. at 41.) Haddad had previously agreed that he would be the Plaintiff's guide at all the sites and would provide any necessary instructions or warnings, a point he confirmed to the Plaintiff upon his arrival in Mexico. (Pl. aff.¶ 3). In fact, even before the Plaintiff left for Mexico, Haddad told the Plaintiff and Barlow Marketing, "just get [the Plaintiff to Mexico] and I'll take care of him from here." (Barlow dep. I at 75–76.). Moreover, the Plaintiff believed that Haddad would be directing him, and told Haddad he was relying on him to provide any instructions or warnings about the sites to be visited. (Pl. aff. ¶ 4; Pl. dep. at 81, 83; Barlow dep. I at 32, 44, 82–83; 101–02, 110; Barlow dep. II at 7.)

On the day of the accident, the Plaintiff and Haddad started by visiting another plant with a wet wash pond, similar in size and shape to Martel's. (Haddad dep. at 45.) However, since that plant was not in operation, no steam was rising from its pond. (Haddad dep. at 46.) When the Plaintiff and Haddad arrived at Martel's plant, they went through a guarded gate, and while Haddad apparently explained the pond's purpose and function, it is unclear whether he disclosed its location. (*Id.* at 38, 52.) While there was no safety orientation, there apparently was something like an "Enter at Your Own Risk" sign in Spanish as mandated by Mexican law. (Haddad dep. at 38.) The Plaintiff apparently did not see the sign, and it is doubtful it would have mattered if he had, since he cannot speak or read Spanish. (Pl. dep. at 37.)

Haddad, who was allegedly in charge of directing the Plaintiff's activities, stayed near the Plaintiff as he videotaped at the first plant, but when they got to Martel's,

he left him and gave no warnings or instructions. (B. Barlow dep I at 96, 101; Haddad dep. at 57, 59; Pl. dep. at 35–36.) Apparently, Haddad did not think he needed to warn the Plaintiff about the pond filled with hot water because, according to him, it was steaming and was being heated by a burner the size of a jet engine. (Haddad dep. at 50–53.) However, the Plaintiff maintains he was unaware of the pond since it was covered by a dusty film the color of the surrounding ground and lacked any sort of warning, fences or railings. (Pl. dep. at 38–39; Pl. aff. ¶ 7.)

While videotaping, the Plaintiff turned, slipped and fell into the pond and sustained serious burns. (Pl.dep. 38.)

## IV. SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir.1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scin-

tilla of evidence in support of the nonmoving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 2512; *North Am. Van Lines, Inc. v. Pinkerton Sec. Sys., Inc.*, 89 F.3d 452, 455 (7th Cir.1996); *In re Matter of Wildman*, 859 F.2d 553, 557 (7th Cir.1988); *Klein v. Ryan*, 847 F.2d 368, 374 (7th Cir.1988). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the non-moving party." *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 322 (7th Cir.1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. *Goka v. Bobbitt*, 862 F.2d 646, 649 (7th Cir.1988); *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.1983), *cert. denied*, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983); *Guenin v. Sendra Corp.*, 700 F.Supp. 973, 974 (N.D.Ind.1988). In ruling on a summary judgment motion, the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence nor the credibility of witnesses. *Anderson*, 477 U.S. at 249–51, 106 S.Ct. at 2511; *North Am. Van Lines, Inc.*, 89 F.3d at 455. However, "[i]t is a gratuitous cruelty to

parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate. *Mason v. Continental Ill. Nat'l Bank,* 704 F.2d 361, 367 (7th Cir.1983).

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Id.* The issue of fact must be genuine. Fed. R.Civ.P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356; *First Nat'l Bank of Cicero v. Lewco Sec. Corp.,* 860 F.2d 1407, 1411 (7th Cir.1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–252, 106 S.Ct. at 2512.

## V. DISCUSSION

### A. The Plaintiffs' Negligence Claim

For a plaintiff to prevail on a negligence claim under Indiana law, he must show (1) the defendant owed him a duty to exercise reasonable care; (2) the defendant breached that duty by failing to conform its conduct to the requisite standard of care; and (3) the plaintiff sustained injuries that were the proximate result of the defendant's breach. *Estate of Heck ex rel. Heck v. Stoffer,* 752 N.E.2d 192, 198 (Ind.Ct. App.2001) (citing *Fast Eddie's v. Hall,* 688 N.E.2d 1270, 1272 (Ind.Ct.App.1997),

*trans. denied* 726 N.E.2d 303 (Ind.1999)). "[A]bsent a duty, there can be no negligence." *Fast Eddie's,* 688 N.E.2d at 1272. "The existence of a duty is a question of law for the court." *Barnes v. Antich,* 700 N.E.2d 262, 266 (Ind.Ct.App.1998), *trans. denied* 714 N.E.2d 172 (Ind.1999).

Here, ADM contends it is entitled to summary judgment because they owed the Plaintiff no duty as a matter of law. "The court balances three factors in determining whether a duty exists: (1) the relationship between the parties; (2) the reasonable foreseeability of harm to the person injured; and (3) public policy concerns." *Id.* "In determining whether a relationship exists that would impose a duty, we must consider the nature of the relationship, a party's knowledge, and the circumstances surrounding the relationship." *Downs v. Panhandle E. Pipeline Co.,* 694 N.E.2d 1198, 1203 (Ind.Ct.App. 1998), *trans. denied* 706 N.E.2d 178 (Ind. 1998).

We will consider each of these factors as we address the Plaintiff's principal contention, that ADM negligently performed Haddad's promise to provide warnings or to otherwise "take care of [the Plaintiff]." (Barlow dep. I at 75–76.)

### 1. The Alleged Negligent Provision of Safety Services

ADM defines its duty by concentrating on what it contends was its relationship with the Plaintiff. The keystone to the argument is their perception that they have only been accused of "nonfeasance" (as opposed to "misfeasance"), so if they had any duty to act it could only have arisen "from a special relationship between the parties." (*See* Def.'s Sept. 4, 2001 Br. at 10) (citing *J.A.W. v. Roberts,* 627 N.E.2d 802, 809 (Ind.Ct.App.1994)). Moreover, ADM argue that because Indiana law has construed the concept of a "special rela-

tionship" narrowly—essentially limited to situations where the level of interaction or dependency between the parties surpasses what is common or usual, no special relationship arose here. *See J.A.W.,* 627 N.E.2d at 809.

However, the Plaintiff contends that because Haddad made a safety promise on behalf of ADM (*i.e.,* to take care of the Plaintiff and warn him of dangers while in Mexico) and negligently performed it (i.e., failing to warn the Plaintiff or guide him away from an unsecured and camouflaged pond filled with scalding water) this was actually misfeasance. In any event, the Plaintiff contends that even if nonfeasance, ADM's promise created a "special relationship," or at least amounted to a gratuitously assumed duty. Finally, the Plaintiff contends that ADM contractually assumed a duty to provide a safe environment for the Plaintiff while in Mexico.

### a. The Relationship Between the Parties and The Misfeasance vs Nonfeasance Debate

■ Misfeasance is negligent conduct and will support liability for a breach in the performance of a gratuitously assumed duty, while nonfeasance is a complete omission or failure to perform. *Johnson v. Owens,* 639 N.E.2d 1016, 1019 (Ind.Ct.App. 1994) (citing *Ember v. B.F.D., Inc.,* 490 N.E.2d 764, 771, *reh'g denied* 521 N.E.2d 981 (Ind.Ct.App.1988)).

■ While ADM contends that Haddad's promise and subsequent alleged failure was merely nonfeasance, a reasonable jury could conclude that Haddad had actually embarked on his role as the Plaintiff's safety supervisor before the two visited the Martel complex. Indeed, Haddad and the Plaintiff had visited other plants before Martel's, and Haddad had always stayed near the Plaintiff while the videotaping occurred. Thus, a jury could reasonably infer from Haddad's hovering over the Plaintiff that he was fulfilling his promise

to warn and take care of the Plaintiff. However, after entering Martel's complex, Haddad inexplicably disappeared, leaving the Plaintiff alone and unguarded to navigate around any hazardous obstacles himself.

While the Plaintiff does not directly cite to the RESTATEMENT (SECOND) OF TORTS, two of its provisions seem particularly apt here:

### § 323. NEGLIGENT PERFORMANCE OF UNDERTAKING TO RENDER SERVICES

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

\* \* \*

### § 324A. LIABILITY TO THIRD PERSON FOR NEGLIGENT PERFORMANCE OF UNDERTAKING

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

RESTATEMENT (SECOND) OF TORTS §§ 323; 324.

■■■ Here, the record reflects that Haddad made his promise to both the Plaintiff's employer (thus, giving rise to possible liability under § 324A of the RESTATEMENT), and the Plaintiff (making § 323 of the RESTATEMENT applicable). Indiana courts recognize that a party may voluntarily undertake a duty to act with due care with respect to another. *England v. Thermo Prods., Inc.,* 956 F.Supp. 1446, 1451 (N.D.Ind.1996) (citing § 323 of the RESTATEMENT; *Claxton v. Hutton,* 615 N.E.2d 471, 474 (Ind.Ct.App.1993); *Lucas v. Dorsey Corp.,* 609 N.E.2d 1191, 1198 (Ind.Ct.App.1993). The same principle was recently recognized in *Light v. NIPSCO Indus., Inc.,* 747 N.E.2d 73, 75 (Ind. Ct.App.2001) (citing § 324A of THE RESTATEMENT). *See also Harper v. Guarantee Auto Stores,* 533 N.E.2d 1258, 1262 (Ind.Ct.App.1989)). In *Light,* the Court of Appeals ultimately concluded "that while a gratuitous promise without more will not impose a duty upon which tort liability may be predicated, when that promise is accompanied by reliance on the part of the promisee, and the reliance was reasonable under the circumstances, a legal duty may be found." *Id.* at 76. "Both the existence and the extent of such a duty are ordinarily questions for the trier of fact." *Id.* (citing *Ember,* 490 N.E.2d at 768).

The point here is that "[c]onsistent with the Restatement rules, the defendant is ... subject to liability if he assumes a duty by making a safety promise, and then negligently performs it, causing injury. This is a simple case of misfeasance and neither privity or nonfeasance rules apply." 2 D.

DOBBS, THE LAW OF TORTS § 321 at 872 (2001); *cf. Ember,* 490 N.E.2d at 769–71. Thus, Haddad's alleged promise to protect and warn (itself a factual dispute), and his subsequent alleged failure to do either, would amount to misfeasance, and possible liability if the jury concludes the Plaintiff reasonably relied on Haddad's promise.

However, even if what ADM did could be considered nonfeasance, there is an issue of fact that precludes summary judgment.

■■ Generally, "[u]nless the defendant has assumed a duty to act, or stands in a special relationship to the plaintiff, defendants are not liable in tort for a pure failure to act for the plaintiff's benefit." 2 D. DOBBS, THE LAW OF TORTS § 314 at 853 (2001); *cf. Light,* 747 N.E.2d at 75–76 (citing *Johnson v. Owens,* 639 N.E.2d 1016, 1019 (Ind.Ct.App.1994)). There are, however, exceptions in which a duty of care may require reasonable affirmative steps by the defendant, viz., the defendant is in such a special relationship to the plaintiff that a duty of care is created that encompasses affirmative action, or the defendant has assumed a duty of affirmative care by action or promise. 2 D. DOBBS, THE LAW OF TORTS § 314 at 853 (2001). The Plaintiff argues that both exceptions apply here.

While the Plaintiff acknowledges that none of the formal relationships usually relied upon to establish a duty exist here, *see* RESTATEMENT (SECOND) OF TORTS §§ 314(A) and 314(B), he suggests that the *ad hoc* relationship between the Plaintiff and Haddad was sufficient to impose a duty. 2 D. DOBBS, THE LAW OF TORTS § 317 at 858 (2001). Indeed, as Indiana law recognizes, the special relationships that give rise to a duty are not necessarily limited to those set out in the RESTATEMENT (SECOND) OF TORTS § 314(A). *See Kinsey v. Bray,* 596 N.E.2d 938, 941 (Ind.Ct.App. 1992).

On this record, a reasonable jury could conclude that the Plaintiff, a relative novice in a foreign land, was unusually dependent upon Haddad for safety guidance through the various construction sites that ADM wanted videotaped. Indeed, a jury could conclude on this record that the Plaintiff justifiably relied on Haddad's assurances, thereby letting down his guard, and this created a "special relationship" and the imposition of a special duty. Of course, the determination of a special relationship must be factually judged on a case by case basis, leading, as it does here, to a mixed question of law or fact as to the existence of such a duty. *See Claxton*, 615 N.E.2d at 474 (Ind.Ct.App.1993).

Similarly, another exception to the general rule may also apply. Indiana law recognizes that the voluntary assumption of a duty can create a special relationship between the parties and a corresponding duty to act as a reasonably prudent person. *Ember*, 490 N.E.2d at 769 (citing *Plan–Tec, Inc. v. Wiggins*, 443 N.E.2d 1212 (Ind.Ct.App.1983)). In such instances, an actor's affirmative conduct and representations must be evaluated by a jury to determine whether a duty was gratuitously assumed. *Ember*, 490 N.E.2d at 770. Here, the jury could reasonably find that ADM, through Haddad, represented that they would safely guide and warn the Plaintiff at all construction sites. Indeed, it could be reasonably inferred, as noted *supra*, that Haddad even undertook to perform this duty, but inexplicably abandoned the Plaintiff at Martel's complex. The jury could also find that the Plaintiff reasonably relied on Haddad's promise, given his unrefuted testimony on the point, and thereby infer that the Plaintiff was lulled into focusing all of his attention on his videotaping, while Haddad watched out for his safety. Of course, whether Haddad made any promises at all and the exact scope of any duty gratuitously assumed is a matter for jury determination and pre-

cludes summary judgment. *Ember*, 490 N.E.2d at 770; *see also* RESTATEMENT (SECOND) OF TORTS § 323.

Nevertheless, because the Plaintiff's claim falls within the law of torts, and not the law of contracts, his alternative assertion that ADM contractually assumed a duty fails. *See* 2 D. DOBBS, THE LAW OF TORTS § 319 (2001).

### b. Foreseeability

■ The second consideration to determine if a duty exists is foreseeability. "Imposition of a duty is limited to those instances where a reasonably foreseeable victim is injured by a reasonably foreseeable harm." *Franklin v. Benock*, 722 N.E.2d 874, 879 (Ind.Ct.App.2000), *trans. denied* 741 N.E.2d 1248 (Ind.2000) (quoting *Ebbinghouse v. FirstFleet, Inc.*, 693 N.E.2d 644, 648 (Ind.Ct.App.1998)). "Such foreseeability does not mean that the precise hazard or exact consequences should have been foreseen, but neither does it encompass anything which might occur." *Indiana Limestone Co. v. Staggs*, 672 N.E.2d 1377, 1382 (Ind.Ct.App.1996), *trans. denied* 726 N.E.2d 306 (Ind.1999).

■ On this record, the Plaintiff was a reasonably foreseeable victim since it is arguable that ADM could reasonably foresee that a local videographer hired to create a marketing tape would be relatively unfamiliar with the dangers associated with a Mexican asphalt plant. Moreover, a jury could conclude it was reasonably foreseeable that someone who was a novice about asphalt plant complexes, the language, and who was concentrating on videotaping, could tumble into an unguarded and camouflaged pool of superheated water he did not know was there. In fact, a jury could infer such forseeability from Haddad's alleged promise of safety and initial supervision of the Plaintiff (which allegedly ended abruptly at Martel's), and

this too evinces a recognition of some danger.

### c. Public Policy

The final considerations in determining a duty are public policy concerns. *Franklin*, 722 N.E.2d at 878. Indeed, "[d]uty is not sancrosanct [sic] in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." *Webb v. Jarvis*, 575 N.E.2d 992, 997 (Ind.Ct.App.1991) (quoting PROSSER & KEATON ON TORTS § 53 (5th ed.1984)).

ADM argues that public policy cautions against finding a duty because it neither owned nor controlled the asphalt plant, and it did not manufacture the pond which injured the Plaintiff. Indeed, it insists that imposing duty here would be tantamount to creating a "duty to be a Good Samaritan." (Def.'s Sept. 4, 2001 Br. at 15) (citing *J.A.W.*, 627 N.E.2d at 809).

Although we do not view public policy to be the pivotal factor in this case, we are not convinced that ADM's public policy concerns are even applicable given the factual claims in dispute here. *See cf. Palmer & Sons Paving, Inc. v. Northern Indiana Public Service Co.*, 758 N.E.2d 550, 556 (Ind.App.2001) (public policy concern not pivotal to imposing duty). Indeed, under the circumstances, public policy suggests that the Plaintiff's claim should go forward because a reasonable jury could find that ADM, through Haddad, undertook a safety promise to protect the Plaintiff and that such vital undertakings should be either honored, or made the basis for recompense if negligently performed.

### 2. Premises Liability

 ADM next argues that it owed no duty to the Plaintiff on a theory of premises liability, because it neither owned nor possessed Martel's plant.

Under the concept of premises liability, only an owner or possessor of real estate owes a duty to individuals entering upon the property. *Risk v. Schilling*, 569 N.E.2d 646, 648 (Ind.1991). Since there is no dispute that ADM does not own the Martel plant complex, the critical question is whether an inference arises that ADM somehow "possessed" the property.

Indiana courts have adopted the definition of a "possessor" of real estate from the RESTATEMENT (SECOND) OF TORTS § 328E (1964):

> A possessor is
>
> (a) a person who is in occupation of the land with intent to control it or
>
> (b) a person who has been in occupation of land with intent to control it, if no other person has subsequently occupied it with intent to control it, or
>
> (c) a person who is entitled to immediate occupation of the land, if no other person is in possession under Clauses (a) or (b).

*See Burrell v. Meads*, 569 N.E.2d 637, 639–40 (Ind.1991); *Risk*, 569 N.E.2d at 647; *Crist v. K–Mart Corp.*, 653 N.E.2d 140, 145 (Ind.Ct.App.1995). Notably, the concepts of "occupation" and "control" are the threads woven through this scheme for imposing liability. *See Great Atl. & Pac. Tea Co. v. Wilson*, 408 N.E.2d 144, 150 (Ind.Ct.App.1980) (control is the basis for imposing liability). The rationale for this proposition is that only a party in control of land can remedy the hazardous conditions that exist there, or take steps to prevent others from entering upon it. *See Saint Casimir Church v. Frankiewicz*, 563 N.E.2d 1331, 1333–34 (Ind.Ct.App.1990); *City of Bloomington v. Kuruzovich*, 517 N.E.2d 408, 411 (Ind.Ct.App.1987).

The Plaintiff contends that ADM should be considered a "possessor" of Martel's plant complex because from his perspective, it "controlled" the property, at least

as to him, by obtaining Martel's permission to enter and use the property and by directing his actions.

Notwithstanding these arguments, we think it is clear that ADM cannot be deemed a possessor of the Martel plant complex as a matter of law because it never occupied, nor was entitled to occupy the plant. Moreover, ADM never intended to exert any control over the complex. Martel owned the plant, directed its employees, controlled plant ingress through a guarded gate (Haddad dep. at 38, 59), and otherwise conducted its day-to-day operation. (Del Signore dep. at 37, 39.)

The mere fact that ADM obtained Martel's permission to enter and videotape the plant complex does not make ADM a possessor. At most, ADM was a mere licensee, someone privileged to enter and remain on Martel's property with his consent. *See Burrell,* 569 N.E.2d at 640 (citing RESTATEMENT (SECOND) OF TORTS § 330 (1964)); *Gaboury v. Ireland Rd. Grace Brethren,* 446 N.E.2d 1310, 1314 (Ind. 1983); *Barbre v. Indianapolis Water Co.,* 400 N.E.2d 1142, 1146 (Ind.Ct.App.1980). Indeed, the definition of licensee clearly fits ADM, as encompassing "[o]ne whose presence upon the land is solely for his own purposes, in which the possessor has no interest, and to whom the privilege of entering is extended as a mere personal favor to the individual[.]" RESTATEMENT (SECOND) OF TORTS § 330 cmt. h (1964). Therefore, since ADM was neither an owner, nor possessor, and exerted no control over the operation of the Martel plant complex, it had no duty to the Plaintiff as a matter of law under a theory of premises liability.

Nevertheless, the Plaintiff argues that even if ADM did not control the plant, it *could* still have warned him of known dangers there. The Plaintiff does not tell us how this is any different than his already existing common law negligence claim or how this fits into a theory of premises liability, and we decline to craft an argument for him.

Finally, the Plaintiff seems to contend that ADM should be liable because its "business enterprise" created a dangerous condition in Indiana that ultimately manifested itself by injuring the Plaintiff in Mexico. This argument is extracted from the Plaintiff's citation to cases involving a landowner's liability for injuries occurring on adjoining land caused by dangerous conditions created by the landowner's special use of his own property. *See, e.g., Ember,* 490 N.E.2d at 772–773 (tavern may have assumed duty to patron beaten in a nearby parking lot used for patron parking); *Kopfinger v. Grand Cent. Pub. Mkt.,* 60 Cal.2d 852, 37 Cal.Rptr. 65, 389 P.2d 529, 533 (1964) (meat market lessee not entitled to judgment of nonsuit where patron slipped on grizzle dropped by defendant on sidewalk).

Of course, it is difficult, except in some metaphysical sense, to conceive how the Martel plant complex in Mexico could be deemed to "adjoin" ADM's manufacturing facilities in Indiana, and left unexplained is how some business enterprise theory would apply. We could find no authorities where the former doctrine has been so radically or elastically applied, and could find none addressing the so-called "business enterprise" theory. Accordingly, we will grant summary judgment on the Plaintiff's premises liability theory.

### 3. Open and Obvious Dangers

 Finally, ADM contends that it had no duty to warn of an open and obvious pond since the Plaintiff already knew about it, and it had no time to warn in any event. In response, the Plaintiff maintains that he did not know about the pond, let alone that it was dangerous.

For negligence claims, there is no duty to warn of dangers which are open and obvious or known to the party injured. *Czarnecki v. Hagenow*, 477 N.E.2d 964, 968 (Ind.Ct.App.1985). Indeed, this duty to warn is "predicated upon the understanding that individuals who have superior knowledge of the dangers posed by a hazard must warn those who lack similar knowledge. When an individual is already aware of the danger, a warning is not necessary." *Carter v. American Oil Company*, 139 F.3d 1158, 1165 (7th Cir.1998) (applying Indiana law); *see also Burton v. L.O. Smith Foundry Prods. Co.*, 529 F.2d 108, 111 (7th Cir.1976) (per curiam) ("[a] duty to warn exists only when those to whom the warning would go can reasonably be assumed to be ignorant of the facts which a warning would communicate.").

Here, as discussed *supra*, the parties dispute both the appearance of the pond and the Plaintiff's awareness of its existence. Indeed, while ADM contends that the pond was an obvious hazard, something akin to a steaming in-ground swimming pool, the Plaintiff maintains he was unaware of its existence because it was camouflaged. This is a classic situation where summary judgment is inappropriate, even if we did not indulge in Indiana's presumption against granting summary judgment on the basis of the open and obvious danger rule. *See Anderson v. P.A. Radocy & Sons*, 67 F.3d 619, 623 (7th Cir.1995) (summary judgment is proper only if no reasonable jury could infer condition was not open and obvious).

Nevertheless, ADM contends that the Plaintiff was actually aware of the pond because he had been to other construction sites, had worked for another company that had videotaped construction sites, and had been provided literature on wet wash asphalt plants. However, even if the Plaintiff had been to other construction sites before, it appears he was inexperienced with the dangers posed by a wet wash pond since his first real encounter with one was at Martel's plant. Moreover, while the Plaintiff may have received literature on asphalt plants, including information on ponds, it is unclear he ever read this material. Obviously, the inferences to which the Plaintiff is entitled preclude summary judgment on this point.

Finally, ADM contends that given the circumstances, it did not have an adequate opportunity to warn the Plaintiff about the pond. Although a duty to warn contemplates both an ability to determine the danger and the opportunity to communicate it, *Norman v. Turkey Run Community School Corp.*, 274 Ind. 310, 411 N.E.2d 614, 618 (1980), we do not believe this principal applies here, at least to the extent that judgment should be granted as a matter of law. For example, in *Norman*, the Indiana Supreme Court held that teachers do not have a duty to warn their students of unexpected, sudden collisions with other students. *Id.* In contrast, ADM here was not faced with a sudden, unexpected hazard and certainly on this record, a reasonable jury could find that ADM had ample opportunity to warn the Plaintiff.

## B. Products Liability Claim

ADM argues that it is entitled to summary judgment on Count II because (1) they did not manufacture the pond which injured the Plaintiff and (2) there is no evidence the asphalt plant was defective.[8] In short, ADM argues the Plaintiff cannot bring his claim within the IPLA.

The Plaintiff responds that a "manufacturer" under the IPLA includes ADM, a

---

8. The Plaintiff concedes the asphalt plant itself was not defective and was properly work-

ing at the time.

designer of a component part (i.e., the wet wash pond) of its product (i.e., the asphalt plant). (*See* November 27, 2001 Br. at 3.)

We start with the concept that the IPLA governs all actions that are:

(1) brought by a user or consumer;

(2) against a manufacturer ...; and

(3) for physical harm caused by a product; regardless of the substantive legal theory or theories upon which the action is brought.

IND.CODE § 34–20–1–1.

Since we assume for purposes of the present motion that the Plaintiff was a "user or consumer," IND.CODE § 34–6–29(4), we move on to whether ADM was a "manufacturer" for purposes of Ind.Code § 34–20–1–1(2).

■ A "manufacturer" is

an entity who designs ... a product or a component part of a product for the sale of the product to a user or a consumer.

IND.CODE § 34–6–2–77(a).

This leads the Plaintiff to contend that ADM's design function involved pond dimensions, specifications for the maximum distance the pond could be from the plant, and submitting a pond drawing to the customer. The Plaintiff's apparent argument is that providing this information constituted designing the pond, and therefore ADM was negligent in failing to exercise reasonable care by not specifying guard rails or fencing in that design, rendering the pond defective and unreasonably dangerous. *See* IND.CODE §§ 34–20–2–2; 34–20–4–1.

However, if we simply focus on the term "designs," this argument quickly breaks down under scrutiny, both factually and legally. For example, the RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 5(b)(1), suggests that liability only attaches when the manufacturer "substantially participates in the integration of the component into the design of the product." RESTATEMENT (THIRD) OF TORTS: PRODUCTS

LIABILITY § 5(b)(1). "Moreover, providing mechanical or technical services or advice concerning a component part does not, by itself, constitute substantial participation...." *See* RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 5 Cmt. e; *see also* 1 L. FRUMER & M. FRIEDMAN: PRODUCTS LIABILITY § 5.05[4] (2001).

Applying these concepts, it cannot be inferred that ADM designed Martel's pond or any part of his complex, except perhaps, providing a footprint layout for its own equipment. This stands to reason because Martel was no novice when it came to asphalt plant facilities, having one complex already on line by the time he contracted with ADM for another asphalt plant. Moreover, ADM had no control, and indeed very little interest in, where Martel would put his pond, how it would be constructed, or even whether he was using a pond as opposed to some other water source. While ADM did provide Martel with some technical guidance or advice as to the water volume of the pond, its maximum distance from the plant, and perhaps some dimensions, this did not constitute substantial participation in the integration of the plant with the pond as a matter of law. *See* RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 5 Cmt. e. Moreover, on this record, we do not even know if Martel ultimately followed ADM's technical advice, or stated somewhat differently, would have followed their advice about safety features if they had offered any. Consequently, ADM was not a "manufacturer" of Martel's pond under the IPLA.

In fact, there is an overarching problem here with the Plaintiff's theory; ADM had no control over what Martel did with their plant at his complex. In that regard, the case is similar to *Shanks v. A.F.E. Indus., Inc.*, 275 Ind. 241, 416 N.E.2d 833 (1981), decided under the RESTATEMENT (SECOND) OF TORTS § 402A. There, the Indiana Su-

preme Court held that the manufacturer of a grain dryer, which otherwise was not defective, could not be held liable to a farm worker who suffered a traumatic amputation from a separate piece of equipment, a grain elevator, even though the dryer's operation was designed to automatically activate the elevator. This result stemmed from the fact that the elevator, a piece of "auxiliary equipment," was not manufactured, installed, or designed by the defendant, even though the dryer was clearly designed, and manufactured for use with the elevator. *Id.* at 836. In short, it is up to the designer of such complex facilities, like Martel here, "to have such warning features incorporated into the design and operation of the overall complex" if thought advisable. *Id.* at 837; *see also York v. Union Carbide Corp.*, 586 N.E.2d 861, 868 (Ind.Ct.App.1992) (the overall designer, not the manufacturer, has a duty to warn).

Moreover, it would be fundamentally improper to allow a jury to retrospectively examine the wisdom of ADM's not offering pond safety design features. *See Shanks*, 416 N.E.2d at 838. Like the equipment in *Shanks*, an asphalt producing facility, particularly one in Latin America, where there is little regulatory oversight, can take many forms depending on the needs of the customer. For example, the final layout depends upon the nature and location of water sources, terrain, available acreage, and the means of ingress and egress. In short, the need for, and the proper design of, safety features depends on various factors, none of which would have been known to ADM. Therefore, the jury should not be called upon to speculate about what ADM should have known regarding Martel's anticipated use of their plant or how safety features should have been incorporated into his complex. *Id.*

Nevertheless, even though the Plaintiff cannot bring a claim under the IPLA, he argues he has a common law negligence claim against ADM for negligent design. This contention, first raised in the Plaintiff's conclusion section of his December 10, 2001 brief, cites no authority and offers no real argument, a not unsurprising observation given the record here. For example, in *York*, 586 N.E.2d at 869, the plaintiff argued that the defendant, a supplier of argon gas, had a duty to participate in the design of an argon delivery system to a steel plant where two workers died from the accumulation of the gas while working in a furnace. However, as the Indiana Court of Appeals noted, there is no foundation in the law for the proposition that the defendant had any duty to "design, install or maintain complicated pipelines for an independent company." *See York*, 586 N.E.2d at 869 n. 6. This aptly describes the situation here, and as discussed *supra*, ADM did not undertake to design, install or maintain Martel's facility, and had no control over how he designed it either.

Finally, the Plaintiffs operate under the apparent presumption that ADM made and sold asphalt, or its by-product, hot water, as opposed to a tool to make asphalt. *See McMahon v. Bunn–O–Matic Corp.*, 150 F.3d 651, 654 (7th Cir.1998). After all, why should ADM be liable in tort for an injury caused by a product (or by-product) made from its tool? *Id.* Indeed, the answer arises from the *McMahon* case itself, where the plaintiff did not even suggest (as presumably the Plaintiff here would) that the maker of coffee brewers somehow had a duty to design styrofoam coffee cups. *Id.* at 657 ("It is far from clear to us that this ... should be laid at the door of Bunn rather than of the cup producer ... or the retailer...."). Therefore, in the final analysis, the Plaintiff's argument regarding the negligent design of Martel's pond has no foundation in law and summary judgment must be granted.

*York*, 586 N.E.2d at 869 n. 6. Consequently, whether the Plaintiff's negligent design claim is one under the IPLA or common law negligence, ADM is entitled to summary judgment as a matter of law.

## VI. CONCLUSION

For the foregoing reasons, ADM's Motion to Strike is DENIED, and its Motion for Summary Judgment is DENIED as to the Plaintiff's negligent provision of safety services claim, but GRANTED as to the Plaintiff's premises liability claim, and GRANTED as to Count II of the Plaintiff's Complaint.